IRA H. RAPHAELSON
United States Attorney

UNITED STATES of America, Plaintiff,

v.

Luis PEREZ–REYES, Defendant.

No. 90 CR 358.

United States District Court,
N.D. Illinois, E.D.

Jan. 10, 1991.

Fred Foreman, U.S. Atty., Jeffrey E. Stone, Asst. U.S. Atty., Chicago, for plaintiff.

Elliot Samuels, Chicago, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CONLON, District Judge.

Defendant Luis Perez–Reyes (Dr. Perez) was indicted on eleven counts of illegal distribution of controlled substances and two counts of mail fraud. On August 2, 1990, Dr. Perez pleaded guilty to one count of illegal distribution of a controlled substance (Count Eleven) before Judge Nicholas Bua. On October 10, 1990, Dr. Perez moved to withdraw his guilty plea, on the ground that the government undercover agent altered several of Dr. Perez' prescriptions by increasing the number of refills. On October 29, 1990, Judge Bua permitted Dr. Perez to withdraw his guilty plea. Judge Bua also recused himself. The case was then reassigned to this court.

The government voluntarily dismissed the eleven counts charging illegal distribution of controlled substances (Counts One through Eleven) that were based on the prescriptions Dr. Perez provided the undercover agent. The remaining mail fraud charges (Counts Twelve and Thirteen) are based upon a false claim Dr. Perez submitted to The Travelers Insurance Company ("Travelers") for nonexistent surgery on the undercover agent and the resulting check issued by Travelers. Dr. Perez moved to dismiss Counts Twelve and Thirteen on two legal theories: (1) false testimony presented to the grand jury, and (2) misconduct of the undercover agent. The court found these contentions without merit and denied the motion to dismiss on December 11, 1990. *See United States v. Perez–Reyes*, 753 F.Supp. 723, (N.D.Ill. 1990).

Dr. Perez waived his right to a jury trial. The parties stipulated to the factual allegations set forth in Counts Twelve and Thir-teen. A bench trial was conducted on December 28, 1990 and January 4, 1991. The court's findings under Fed.R.Crim.P. 23(c) follow.

## FINDINGS OF FACT

The Stipulated Facts

1. During 1989 and January 1990, Dr. Perez was a licensed physician practicing in Chicago.

2. In December 1989, Dr. Perez participated in preparing and submitting an insurance claim form to Travelers. The insurance claim falsely represented that Dr. Perez surgically excised three benign lesions from a patient named "Thomas Conroy" [1] on November 18, 1989. Dr. Perez signed the claim form (Government Exhibit 1), which sought reimbursement from Travelers in the amount of $1090.

3. Dr. Perez knew that he had not performed the surgical and medical procedures described on the claim form initially submitted to Travelers in December 1989.

4. On January 4, 1990, Dr. Perez resubmitted to Travelers the false claim form concerning the November 18, 1989 surgery and related medical procedures purportedly performed on "Thomas Conroy." Government Exhibit 2. The duplicate claim form was mailed to Travelers by certified mail. Government Exhibit 2–A. [2]

5. The receipt for the certified mailing was found in Dr. Perez' office during a search conducted pursuant to a warrant on April 12, 1990. Government Exhibit 2–B.

6. On January 18, 1990, Travelers mailed Dr. Perez a check for $792, in payment for the November 18, 1989 surgery purportedly performed on "Thomas Conroy." Government Exhibit 3. [3] Dr. Perez personally received approximately $392 of the proceeds from the Travelers check.

7. If Thomas Shader, the undercover agent who posed as "Thomas Conroy,"

---

**1.** "Thomas Conroy" was the fictitious name used by the undercover agent, Thomas Shader, in his dealings with Dr. Perez.

**2.** This mailing is the subject of Count Twelve.

**3.** This mailing is the subject of Count Thirteen.

were called as a trial witness, he would refuse to testify and would assert his privilege against self-incrimination under the fifth amendment of the United States Constitution.[1]

The Entrapment Defense

8. The entrapment defense turns on Dr. Perez' testimony. The government relies on its cross-examination of Dr. Perez and the objective circumstances of the offenses to negate entrapment. The court accepts some of Dr. Perez' uncontradicted testimony at face value, while rejecting other portions of his testimony as implausible for the reasons noted.

9. In 1989, Dr. Perez was only seeing three or four patients a day and had no employees. It is reasonable to conclude that Dr. Perez' practice was not doing well financially.

10. Shader first appeared at Dr. Perez' office on October 4, 1989, complaining of headaches, coughing and nasal congestion. Dr. Perez examined Shader, diagnosed his condition as an upper respiratory infection, mild hypertension, obesity, and traumatic fibrosinovitis of the lumbosacral spine, and prescribed an antibiotic, cough medicine, Tylenol No. 3, and Darvon Compound 65. No refills were authorized. Dr. Perez charged Shader $50 and instructed him to return in five days.

11. Shader did not contact Dr. Perez again until November 16, 1989. Shader first telephoned Dr. Perez and reported that his cough was better, but that he wanted to see Dr. Perez about his chronic backache and headaches. Shader visited Dr. Perez' office later that day. Dr. Perez examined Shader and gave him prescriptions for Tylenol No. 3 and Darvon Compound 65. No refills were authorized.

12. After Dr. Perez gave Shader the prescriptions, Shader requested prescriptions for "Monica Suarez." Shader identified Suarez as his girlfriend. Shader described Suarez' purported medical prob-

lems, a chronic "smoker's cough" and severe vaginal itching.

13. Although Perez never saw or examined Suarez, he gave Shader prescriptions in Suarez' name for cough medication and vaginal cream. No refills were authorized. Dr. Perez asked Shader to bring Suarez in to see him. Dr. Perez also created a patient file under the name "Monica Suarez."

14. Dr. Perez admitted in his direct testimony that as a practitioner of 25 years, he knew it was not good medical practice to prescribe medication for a person he had never seen. When questioned on cross-examination whether this practice was unethical and medically dangerous, Dr. Perez hedged, reluctantly admitting the practice might be unethical if done three or more times.

15. Based on Dr. Perez' demeanor, his years of experience, the fact he continued to give Shader prescriptions in the name of "Monica Suarez" over an extended period of time without ever having seen Suarez, and the fact he created a bogus medical file to support the Suarez prescriptions, the court concludes that Dr. Perez knew his prescriptions under the "Suarez" name were unethical and presented a potential medical danger. The court also finds that this repeated course of conduct reflects adversely on Dr. Perez' credibility and reliability as a witness.

16. Dr. Perez justified giving Shader the Suarez prescriptions because he liked Shader and Shader provided a description of Suarez' medical problems. There is no evidence that Dr. Perez engaged in this unethical practice because of any untoward pressure by Shader.

17. During his second visit on November 16, 1989, Shader requested another favor. Shader claimed that his previous physician helped him recoup his insurance deductible at the end of the year by making an insurance claim.

18. Dr. Perez testified that he adamantly refused to help Shader in this manner,

**4.** The Assistant United States Attorney forthrightly advised the court and defense counsel that Shader, who has been suspended as an investigator for the Illinois Department of Pro-

fessional Registration, is currently the subject of a federal grand jury investigation for altering prescriptions of several other physicians in the course of his investigative work.

telling Shader that what he requested was "a fraud" and "illegal." Dr. Perez further testified that he ordered Shader to leave his office.

19. Based upon his demeanor while testifying and his own subsequent conduct, as well as his prior convictions for filing false medical claims, the court finds incredible Dr. Perez' testimony that he adamantly rejected Shader's first overture and ordered Shader to leave his office.

20. It is undisputed that in 1982, Dr. Perez pleaded guilty in state court to three counts of an indictment charging 10 counts of theft and 19 counts of vendor fraud for submitting false claims for nonexistent medical services to the Illinois Department of Public Aid. Government Exhibit 6. Dr. Perez received 30 months probation, a $10,000 fine, and his medical license was suspended for an unspecified period of time. Dr. Perez admitted on cross-examination that he engaged in this conduct out of greed. Nevertheless, during redirect examination, Dr. Perez asserted that the earlier charges, to which he pleaded guilty with the assistance of counsel, were all a mistake occasioned by his clerical employees.

21. Dr. Perez' attempts to explain away his earlier convictions are as revealing as the prior convictions themselves. Perhaps Dr. Perez is unable to recognize and accept his culpability for earlier fraudulent conduct. Given the internal inconsistencies of his testimony, his past convictions for similar conduct, and his denigration of his prior fraudulent conduct, Dr. Perez was not a credible witness on the central issues regarding his state of mind and the degree of Shader's importuning.

22. Well-knowing the consequences of submitting false medical claims, the court infers that Dr. Perez was cautious about submitting a false claim for Shader.

23. Several days later, on November 18, 1990, Shader telephoned Dr. Perez and repeated his request that the doctor submit an insurance claim for him. Dr. Perez testified that he again refused, but because he was with a patient at the time, he tried to put Shader off by stating that he would think about it.

24. Three days later, Shader called again and asked Dr. Perez if he had thought about the insurance claim. Dr. Perez testified that he refused "to help" Shader, but that Shader implored him because Christmas was coming and Shader needed cash.

25. Dr. Perez, by his own admission, responded that he would see what he could do for Shader.

26. About a week later, Shader called and asked when he could bring over the insurance forms. Dr. Perez testified that during this conversation, Shader repeatedly insisted Perez had promised to fill out the form for him and it was too late in the year to get another doctor to do it.

27. Dr. Perez admits telling Shader to bring the insurance forms into his office. Dr. Perez testified that he was just trying to stall Shader when he said this.

28. Dr. Perez' testimony about his innocent intentions in telling Shader to bring the insurance papers to his office was self-serving and incredible.

29. Shader next visited Dr. Perez' office on December 4, 1989. Dr. Perez testified that Shader demanded that Perez assist him by filling out the diagnosis and procedures sections of a Travelers insurance claim form. Dr. Perez described Shader's demeanor as forceful and demanding, and that Shader's financial desperation led Dr. Perez to supply false diagnostic, treatment and billing information on the insurance form. Dr. Perez further testified that he did not expect to receive any of the proceeds from the false insurance claim.

30. In evaluating the credibility of the foregoing testimony, the court considers Dr. Perez' demeanor and manner while testifying, as well as the fact that Dr. Perez admittedly came up with the idea of using, as a model for the false claim, a file he had prepared several months earlier for another of his patients, William Debrot, and the billings that were reimbursed by Travelers for Debrot. Government Exhibit Debrot 1(a), (b), (c).

31. The court also considers the fact that Dr. Perez maximized the false claim by increasing his consulting fee from $60 for the Debrot claim to $100 for the fraudulent claim. Dr. Perez used his own expertise and experience with Travelers in affirmatively contributing to the creation of a false claim that Travelers would accept at face value, while maximizing the amount billed.

32. The court further considers the fact that Dr. Perez, on his own initiative, entered false information in Shader's patient file to conceal the fraud in the event there was an investigation.

33. Finally, Dr. Perez' prior fraudulent claims and billings to the Illinois Department of Public Aid are probative of his knowledge of the illegality of this conduct and of his predisposition to prepare fraudulent medical records and to submit false billing information for personal gain.

34. Shader successfully tricked and deceived Dr. Perez, and presented the doctor with an opportunity to make some easy money. Under all the circumstances presented, however, the court does not believe that Shader pressured Dr. Perez to engage in unlawful conduct that Perez was not already predisposed to commit.

35. On December 4, 1989 and December 8, 1989, Dr. Perez gave Shader additional prescriptions in the name of "Monica Suarez," even though he still had never seen her. Government Exhibits Perez 7(c), (d).

36. When the insurance check did not arrive by January 4, 1990, Shader returned to Dr. Perez' office with more insurance forms. Shader asked Dr. Perez to fill out the forms again with the same false information contained in the claim they completed in December. Shader explained, with the assistance of someone Shader contacted by telephone, that he had sent the first claim to the wrong place and that they should resubmit the claim to the attention of a specific individual.

37. During Shader's January 4th visit, Dr. Perez not only completed the fraudulent claim form again, but he also gave Shader more prescriptions because Perez was "unable to say no." Dr. Perez' self-serving rationalizations are not credible.

38. When the Travelers check arrived on January 24, 1990, Dr. Perez endorsed it and gave Shader half of the $792 proceeds. The court does not believe Dr. Perez' testimony that he never before discussed the subject of sharing the proceeds with Shader and that he never intended to get any personal benefit from the fraudulent insurance claim.

39. On the same day, Dr. Perez sold Shader 100 Tylenol #2 tablets for $100. Dr. Perez testified that he only did so, because Shader would not take "no" for an answer. The court does not view this testimony as credible, particularly given the fact that Dr. Perez admits that he set the price and personally profited from the transaction.

40. Again, on February 27, 1989, Dr. Perez gave Shader prescriptions for Tylenol #3 and a codeine compound; he also prescribed Seconal in the name of "Monica Suarez," although he still had not seen her. Government Exhibit Perez 7(f).

41. Dr. Perez admitted on cross-examination that, as early as December 8, 1989, he was "skeptical" as to whether the prescriptions Shader requested were for resale.

42. On March 7, 1990, Dr. Perez sold Shader 1,000 Tylenol #2 tablets and 100 valium tablets for $1,300 in cash. Dr. Perez set the price and profited from the transaction.

43. Later in March, Shader wanted to purchase a substantial quantity of Tylenol. At that time, Dr. Perez ordered Tylenol from his supplier, as well as valium.

44. Dr. Perez testified that in late March, he offered the most resistance to Shader's forceful demands. However, the court reviewed the transcript of a telephone conversation between Dr. Perez and Shader recorded on April 3, 1990. Government Exhibit Perez 1–A. Dr. Perez evidenced no reluctance or hesitation in offering to sell Shader 200 Tylenol tablets; he even inquired whether Shader wanted more valium. *Id.* at 2. In addition, Dr. Perez

stated he would be able to sell Shader another 1,000 Tylenol tablets and 100 tablets of valium in eight to ten days. *Id.* at 2–3. Most revealing, Dr. Perez invited Shader to come over to his office in the interim and get the Tylenol that Dr. Perez had on hand. *Id.* at 4. This recorded conversation is remarkably inconsistent with Dr. Perez' testimony that on April 3, 1990, he told Shader he did not want to see him again for at least a year.

45. In a follow-up telephone conversation recorded on April 11, 1990, Dr. Perez informed Shader that his drug shipment arrived; the Tylenol he received was "stronger than the other ones" (presumably Tylenol # 3, which contains more codeine than Tylenol # 4). Government Exhibit Perez 2–A. Dr. Perez also informed Shader he had five bottles of valium tablets for him, and the total price for all these drugs was $4,000. *Id.* at 3. Dr. Perez specified that he wanted payment in $100 bills. *Id.*

46. The foregoing conversations establish that Dr. Perez conducted himself as a willing and eager drug seller, setting a profitable price for his sales to Shader. Dr. Perez testified that at this time, Shader was pushing him the hardest and Perez was attempting to resist Shader's pressure. This testimony was thoroughly impeached by the taped conversation. Accordingly, the court finds Dr. Perez' testimony about Shader's strong-arm tactics and his own passive role not worthy of belief.

47. Dr. Perez offered witnesses who testified to his reputation for honesty and truthfulness. These witnesses were well-intentioned persons who think highly of Dr. Perez. Nevertheless, this testimony was unpersuasive in light of all the other evidence.

48. Dr. Perez offered testimony by Shader's superiors at the Illinois Department of Professional Registration to establish that Shader's performance ratings and recommendations for salary increases were affected to some extent by the number of prosecutable cases he made. This unremarkable evidence does not support a conclusion that Shader was given an incentive to pressure an unwilling doctor to engage in fraudulent activity.

49. The court finds from the state of the record that Shader altered two of Dr. Perez' prescriptions by increasing the designated number of refills.

### CONCLUSIONS OF LAW

1. The stipulation of facts establishes the requisite elements of the mail fraud offenses charged in Counts Twelve and Thirteen.

2. To successfully establish an entrapment defense, Dr. Perez must show that Shader, the government's undercover agent, induced him to participate in a scheme to defraud The Travelers Insurance Company and that he was not predisposed to do so. *United States v. Franco,* 909 F.2d 1042, 1044 (7th Cir.1990).

3. Dr. Perez has failed to offer credible evidence that Shader offered him anything more than a profitable opportunity to participate in a fraudulent insurance claim.

4. Dr. Perez has failed to offer any credible evidence that he was not predisposed to make a fraudulent claim involving nonexistent medical services for financial gain.

5. Lack of predisposition is not shown by Dr. Perez' initial reluctance to accept Shader's solicitation to prepare a fraudulent insurance claim. *United States v. Perez–Leon,* 757 F.2d 866, 872 (7th Cir.), *cert. denied, Gonzalez v. United States,* 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985); *United States v. Thoma,* 726 F.2d 1191, 1197 (7th Cir.), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984) *citing United States v. Steinberg,* 551 F.2d 510, 514 (2d Cir.1977) (defendant's reluctance may merely indicate an attempt to protect himself against prosecution).

6. The objective evidence demonstrates that within a short time after Shader's initial solicitation, Dr. Perez embraced the fraudulent scheme and contributed his own expertise and ingenuity in fabricating medical records and in formulating a diagnosis, treatment and a phony billing statement to effectuate the scheme.

7. Even had Dr. Perez offered credible evidence that Shader incited the fraudulent scheme and that Dr. Perez lacked predisposition, the government satisfied its corresponding burden of establishing beyond a reasonable doubt Dr. Perez' predisposition to make false claims involving nonexistent medical services for personal gain. *Franco*, 909 F.2d at 1044. Dr. Perez has engaged in similar fraudulent conduct in the past and he profited from the scheme charged here. These are among the five factors relevant in determining whether Dr. Perez was predisposed to commit the offenses charged. *United States v. Rivera–Espinoza*, 905 F.2d 156, 158 (7th Cir. 1990).

8. Because the government has established Dr. Perez' predisposition beyond a reasonable doubt, the entrapment defense fails. *United States v. Hinkle*, 637 F.2d 1154, 1158 (7th Cir.1981).

9. Dr. Perez may not base his entrapment defense on Shader's purported misconduct, in view of his own predisposition to commit the crimes Shader importuned. *Id., citing Hampton v. United States*, 425 U.S. 484, 489, 96 S.Ct. 1646, 1649–50, 48 L.Ed.2d 113 (1976); *United States v. Kaminski*, 703 F.2d 1004, 1006–08 (7th Cir. 1983).

10. Because Dr. Perez clearly was inclined to commit the fraud charged, the government was free to use substantial and repeated inducement in order to establish a prosecutable case. *Kaminski*, 703 F.2d at 1008.

11. The court finds beyond a reasonable doubt that Dr. Perez is guilty as charged in Counts Twelve and Thirteen of the superseding indictment. Judgment shall be entered accordingly.