**UNITED STATES of America, Plaintiff,**

v.

**Khadir GHANAYEM, Defendant.**

**No. 93 CR 510-1.**

United States District Court,
N.D. Illinois, E.D.

Jan. 20, 1994.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

Following a jury trial, Khadir Ghanayem was convicted of conspiracy to possess cocaine, with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. § 2, and was found not guilty of attempt to possess cocaine, with intent to distribute.[1] Ghanayem now moves for judgment of acquittal, pursuant to Fed.R.Crim.P. 29(c), contending, *inter alia*, that the government failed to prove beyond a reasonable doubt that he was not entrapped. Ghanayem moves in the alternative for a new trial, pursuant to Fed.R.Crim.P. 33.

## BACKGROUND

Ghanayem was charged in a two-count indictment, alleging that between March 30, 1993 and May 23, 1993, Ghanayem was part of a conspiracy to possess, with the intent to distribute, kilogram quantities of cocaine. At trial, evidence was presented that Ghanayem: (1) met with undercover agent William Grant of the Drug Enforcement Agency about setting up a large cocaine purchase; (2) discussed the particulars of the transaction with agent Grant; and (3) introduced agent Grant to his cousin, Mazen Shunnarah, for the purposes of consummating the deal. On October 20, 1993, after a three-day trial, the jury found Ghanayem guilty of conspiracy to possess cocaine and not guilty of attempt to possess cocaine. Ghanayem's motion in open court for judgment of acquittal was denied. In his post-trial motions, Ghanayem again moves for judgment of acquittal, raising numerous challenges to his conspiracy conviction. Ghanayem moves in the alternative for a new trial.

James B. Burns, U.S. Atty., Steven Shobat, Asst. U.S. Atty., Chicago, IL, for plaintiff.

Stephen K. Milott, Chicago, IL, for defendant.

## DISCUSSION

### 1. Motion For Judgment Of Acquittal

In challenging a conviction under Fed.R.Crim.P. 29(c), Ghanayem "carries a

---

1. Ghanayem's co-defendant, Christ Theodosopoulos, also was found guilty of conspiracy to possess cocaine and not guilty of attempt to possess cocaine. Theodosopoulos' motion for judgment of acquittal was granted immediately following the return of the guilty verdict. *See* Fed.R.Crim.P. 29(b).

558

heavy burden." *United States v. Campbell,* 985 F.2d 341, 344 (7th Cir.1993). Ghanayem must show that, viewing the evidence in the light most favorable to the prosecution, a rational jury could not have found him guilty. *See United States v. Ortiz,* 5 F.3d 288, 292 (7th Cir.1993). In reviewing Ghanayem's conviction, the court does not assess the credibility of witnesses, weigh evidence, or draw inferences—these are solely jury functions. *See United States v. Marquardt,* 786 F.2d 771, 780 (7th Cir.1986). Instead, the court must determine whether the government has presented evidence on every element of its case sufficient for the jury to have found Ghanayem guilty beyond a reasonable doubt. *Id.*

Chief among Ghanayem's challenges is that his conviction was the result of entrapment. Ghanayem contends that a rational jury could not have found him guilty beyond a reasonable doubt because he established the defense of entrapment as a matter of law. Ghanayem asserts that the government presented no evidence of prior disposition to commit the crime, while he presented ample evidence of inducement. He concludes that the government's failure to prove predisposition is sufficient to warrant his acquittal.

**2. Entrapment/Predisposition**

The entrapment defense is based on the premise that "the function of law enforcement officials ... does not include the manufacturing of crime." *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 820, 2 L.Ed.2d 848 (1958). Accordingly, government agents may not "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." *Sorrells v. United States,* 287 U.S. 435, 442, 53 S.Ct. 210, 212–213, 77 L.Ed. 413 (1932). The defense of entrapment is designed to "prevent the police from turning a law-abiding person into a criminal." *United States v. Evans,* 924 F.2d 714, 717 (7th Cir.1991).

■ Entrapment is established if: (1) the defendant shows that he was induced to commit the crime; and (2) the government cannot prove beyond a reasonable doubt that the defendant was disposed to commit the crime

prior to being approached by the government. *See Jacobson v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992); *United States v. Groll,* 992 F.2d 755, 759 (7th Cir.1993). In practice, the inducement and predisposition elements of the entrapment defense tend to merge. *See Groll,* 992 F.2d at 759 ("inducement and predisposition are not wholly distinct from each other"); *United States v. Evans,* 924 F.2d 714, 717 (7th Cir.1991) (the entrapment test "suggests a certain semantic disarray"). The central inquiry for the jury was whether Ghanayem possessed "something like predisposition, in the sense of inordinate willingness to participate in criminal activity." *Evans,* 924 F.2d at 717.

The government does not seriously dispute that Ghanayem was induced to commit the crime for which he was convicted. The government's brief virtually concedes that there was some inducement in this case by declaring equivocally that there was "*almost* no inducement by government agents." Response at 4 (emphasis added). As discussed below, there was substantial evidence of inducement presented by the government's evidence. Hence, the sole issue in this case is predisposition. *See Jacobson,* —— U.S. at ———— —— n. 2, 112 S.Ct. at 1540–41 n. 2 (when government does not dispute inducement, the sole issue is whether government carries its burden on predisposition). The burden was on the government to establish beyond a reasonable doubt Ghanayem's predisposition to engage in drug trafficking. *See Id.* at ——, 112 S.Ct. at 1540.

■ Ghanayem argues that the government did not meet its burden of proving predisposition because it presented no evidence to establish prior intent. Motion ¶ 5. The government was not required to present direct proof that Ghanayem was inclined to commit the offense; Ghanayem's predisposition to engage in the drug conspiracy could be established through circumstantial evidence. In *Jacobson v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1541, 118 L.Ed.2d 174 (1992), the Supreme Court found that predisposition may be inferred from the circumstances of the crime. The Court wrote that when agents offer a defen-

dant the opportunity to commit a crime and the defendant "promptly avail[s] himself of this criminal opportunity," the entrapment defense fails as a matter of law. Thus, at a minimum, the government was required to establish circumstantially that Ghanayem was inclined to participate in a conspiracy to distribute cocaine.

■ In determining whether a defendant was predisposed to commit an offense, the Seventh Circuit has relied on factors such as an overall assessment of the defendant's character, evidence of prior offenses, an apparent reluctance to commit the crime, and the nature of the government inducement. *See United States v. Perez–Leon,* 757 F.2d 866, 871 (7th Cir.), *cert. denied sub nom. Gonzalez v. United States,* 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985); *United States v. Rivera–Espinoza,* 905 F.2d 156, 158 (7th Cir.1990). The Seventh Circuit has found that there is a "presumption of predisposition resulting from the criminal undertaking." *United States v. Groll,* 992 F.2d 755, 759 (7th Cir.1993). However, the burden is ultimately on the government to prove predisposition beyond a reasonable doubt. *Id.*

On Ghanayem's motion for acquittal, the court must determine whether the government presented sufficient evidence from which the jury could conclude beyond a reasonable doubt that Ghanayem was predisposed to engage in a drug conspiracy. Upon reviewing the evidence presented, it is clear that the government did not present sufficient evidence.

**3. The Government's Predisposition Evidence**

**a. The government presented no evidence that Ghanayem had a previous drug history**

■ The first factor routinely relied upon by the Seventh Circuit weighs heavily against a finding of predisposition. The government presented no evidence that Ghanayem had ever been involved in, arrested for, or convicted of any drug offense—or any other offense. Indeed, no evidence was pre-

sented to suggest that Ghanayem ever had anything to do with illegal drug trafficking.[2] The lack of evidence of prior drug dealing should have suggested to the jury that Ghanayem was not inclined to participate in a drug transaction before he was approached by agent Grant.

**b. The government admittedly induced Ghanayem to arrange a cocaine deal**

The second factor also should have suggested a lack of predisposition. The government clearly (and admittedly) induced Ghanayem to set up a drug deal. In an effort to arrange a cocaine sale to Shunnarah, the government sought out Ghanayem, Shunnarah's cousin, in a "reverse buy" undercover operation. The entire undercover operation was designed to catch Shunnarah; Ghanayem was used as bait to catch his cousin. The party that initiated negotiations to sell cocaine and actually attempted to sell cocaine was the government. The Seventh Circuit has held:

> The stronger the inducement, the more difficult it is for the government to prove that the defendant would have committed the crime on a different occasion had the particular inducement not been offered.

*United States v. Hollingsworth,* 9 F.3d 593, 597 (7th Cir.1993). As agent Grant testified, the reverse buy transaction was arranged to apprehend Shunnarah, not Ghanayem; the government was not even investigating Ghanayem when the undercover operation was initiated—it had no information that Ghanayem was involved in Shunnarah's drug syndicate. *See* Tr. at 110–11. Given the lack of evidence of Ghanayem's involvement in any previous drug transaction, the government's orchestration of the sale of cocaine to Shunnarah weighs heavily against a finding of predisposition by Ghanayem.

**c. The government did not present sufficient circumstantial evidence to support a finding that Ghanayem was predisposed to arrange a drug deal**

The first two factors weigh against a finding that Ghanayem was predisposed to en-

---

**2.** On cross-examination, agent Grant volunteered his belief that Ghanayem had once been arrested for marijuana possession. Tr. at 224. This un-

substantiated statement was insufficient to support a reasonable inference that Ghanayem had previously been involved in drug trafficking.

gage in the drug conspiracy: the government did not present evidence that Ghanayem was previously involved in drug offenses but did present evidence that Ghanayem was a pawn in a game designed to apprehend Shunnarah. However, the government may establish that Ghanayem was predisposed to arrange the cocaine transaction through the circumstances of the offense—particularly through evidence of Ghanayem's behavior after he was approached by government agents. *See Jacobson v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992). The government could show circumstantially that Ghanayem was likely to commit a drug offense even without government involvement. The question is whether Ghanayem was or was not the type of person "who if left to his own devices probably would never have run afoul of the law." *United States v. Hollingsworth,* 9 F.3d 593, 598 (7th Cir.1993) (citation and emphasis omitted).

In order to determine whether the government presented sufficient evidence that Ghanayem was predisposed to participate in a drug transaction, the court examines the evidence presented to the jury regarding the earliest meetings between Ghanayem and agent Grant. The inquiry is not whether Ghanayem ultimately became an active and willing participant in the drug deal, but whether he was predisposed to be involved regardless of government intervention. The court must determine whether there was sufficient evidence from which the jury could have concluded that Ghanayem was inclined to participate in a drug transaction before he was approached by government operatives.

### i. The initial meeting

Agent Grant and Ghanayem both testified about the first two times that they came into contact.[3] Agent Grant testified that he first met Ghanayem at the 1-2-3 Club on the night of March 30, 1993. Agent Grant and a confidential informant ("the informant") entered the bar at about 10:30 p.m. The informant spotted Ghanayem, and pointed him out to agent Grant. Ghanayem and the informant waived to each other, and then the informant and agent Grant came over to Ghanayem and struck up a conversation. Tr. at 110–12.

Agent Grant testified that upon first speaking with the informant, Ghanayem stated that he was now working at a different auto repair shop. The conversation then turned to Ghanayem's cousin, Mazen Shunnarah, and Ghanayem stated that Shunnarah had moved to Lexington, Kentucky. Finally, Ghanayem told the informant that if he needed anything, he should call Ghanayem at work. Ghanayem gave the informant his business card. According to agent Grant, the conversation lasted about twenty minutes. Tr. at 112–13.

Ghanayem testified that he met with the informant on the night of March 30, 1993, but did not meet agent Grant that night. Ghanayem testified that the informant asked about Shunnarah. Ghanayem responded that he had not spoken to Shunnarah for six months because he (Ghanayem) had been in Jordan for his marriage. Ghanayem testified that the conversation switched to cars. Ghanayem told the informant about his new job at an auto body shop and gave the informant his business card to solicit car repair work. According to Ghanayem, he did not discuss Shunnarah with the informant for more than a few moments. Tr. at 468–69.

### ii. The first cocaine discussion

Grant and Ghanayem next met on April 22, 1993. Agent Grant testified that at about 12:30 p.m., he and the informant visited Ghanayem at George's Automotive Repair, where Ghanayem works.[4] Agent Grant arrived in a Mercedes Benz convertible and asked to have the windshield repaired. After the conversation regarding the repairs concluded, the informant asked if Ghanayem knew of anyone interested in buying cocaine. According to agent Grant, Ghanayem cautiously

---

**3.** The first two meetings between Ghanayem and agent Grant were not tape-recorded. Agent Grant testified that the initial meeting was not taped because it took place at a crowded bar, and that it was impossible to tape a conversation there. Tr. at 112.

**4.** This meeting was tape-recorded. However, the tape recording is inaudible. Tr. at 116–17.

looked around and then asked how much agent Grant had to sell. After telling Ghanayem that he had five kilos, Ghanayem asked about quality and price. Agent Grant testified that Ghanayem said that he knew of someone who might be interested in buying the cocaine, and he would try to reach him. According to agent Grant, at the end of this meeting there was an understanding that Ghanayem would attempt to arrange a cocaine transaction and would call the informant to confirm the deal. Tr. at 115–20.

Ghanayem's testimony regarding the April 22 meeting sharply contradicts agent Grant's version. Ghanayem testified that on April 22 he met agent Grant for the first time. Ghanayem testified that agent Grant asked to have the windshield of his Mercedes repaired. According to Ghanayem, agent Grant then turned the conversation to cocaine by mentioning to Ghanayem that he had some cocaine that he was interested in selling. Ghanayem testified that he responded that he does not buy, sell, or do drugs. The informant then brought up Shunnarah, and asked if Ghanayem could contact him. Ghanayem did not testify as to his response to the informant's question regarding Shunnarah. Tr. at 469–71.

Based on this evidence alone, the jury reasonably could have concluded that Ghanayem was predisposed to engage in a conspiracy to purchase cocaine. It was the jury's responsibility to weigh conflicting testimony and to draw reasonable inferences from the evidence. The jury was free to attach more credibility to agent Grant's testimony than to Ghanayem's and to resolve all contradictions in agent Grant's favor.[5] According to agent Grant, Ghanayem was amenable to setting up a cocaine transaction from the start: (1) as soon as a cocaine deal

was suggested, Ghanayem asked about quantity, quality, and price; and (2) Ghanayem stated that he knew of someone who would be interested in buying the cocaine, and that he would arrange a deal. Taking this testimony in a vacuum, the jury was presented with sufficient evidence upon which to find that Ghanayem was predisposed to arrange a cocaine deal. However, the testimony of agent Grant and Ghanayem must be considered together with the unimpeached taped conversations introduced by the government. These tapes, which the government introduced into evidence as authentic representations of later recorded conversations, effectively undercut the weight and reliability of agent Grant's testimony about Ghanayem's behavior at the earlier meetings.[6] In light of the tapes, the government's evidence was insufficient to support a finding of predisposition.

### iii. The taped meetings

After the initial meeting at the body shop, Ghanayem did not call the informant to confirm a deal—as Grant testified Ghanayem had agreed to do. Two weeks later, on May 7, 1993, agent Grant visited Ghanayem at work. The conversation on May 7 was taped, as were the ensuing conversations between agent Grant and Ghanayem, and the tapes were received in evidence. Gov.Exs. 9–15. The tape of the May 7 meeting unambiguously shows that Ghanayem was not eager to participate in a drug transaction at that meeting with agent Grant. Based on Ghanayem's taped statements at the May 7 meeting, agent Grant's testimony regarding Ghanayem's behavior at the April 22 meeting is of questionable reliability and accuracy. Ghanayem's words and behavior at the May 7 meetings,—behavior that is fully document-

---

5. A number of courts have held that evidence that a defendant is initially reluctant to engage in criminal activity is insufficient to support a reasonable inference that he was not predisposed to engage in the crime. *See United States v. Perez–Leon,* 757 F.2d 866, 872 (7th Cir.), *cert. denied sub nom., Gonzalez v. United States,* 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985); *United States v. Perez–Reyes,* 754 F.Supp. 637, 642 (N.D.Ill.1991). It should be noted that these decisions were issued before the Supreme Court altered the burden of proof in entrapment cases in *Jacobson v. United States.*

6. Generally a jury is free to discount taped evidence and to rely on live testimony instead. However, the government—the party that introduced and authenticated the tapes—specifically vouched for the authenticity and reliability of the tapes and for the accuracy of their substance. By introducing the tapes into evidence, the government is deemed to have admitted their content.

ed by the government's own taped exhibits—belies agent Grant's testimony that Ghanayem was easily amenable to arranging a cocaine deal at the April 22 meeting. The tapes should raise a reasonable doubt in the mind of a rational juror concerning what Ghanayem may have said or done at the two earlier unrecorded meetings. Because of the clear contradictions between agent Grant's testimony about Ghanayem's behavior and the taped evidence, the government did not present substantial evidence of Ghanayem's predisposition to engage in a drug conspiracy.[7]

The May 7 tape establishes the following: After discussing repairs to the car for a few minutes, agent Grant broached the subject of the cocaine deal. Gov.Ex. 9 at 4. Ghanayem stated that he had been unable to reach Shunnarah. Ghanayem stammered that:

> He never called me, I was wanting a ... wasn't able to get a hold of me, he couldn't get a hold of it.

*Id.* Agent Grant told Ghanayem that Grant would be receiving more cocaine to set up another deal in the future. Ghanayem answered less than enthusiastically, "whenever, whenever." Gov.Ex. 9 at 5. Ghanayem then turned the conversation back to car repairs. Agent Grant opened the cocaine discussion again by asking: "Do you know anyone else [other than Shunnarah] that might be interested?" Gov.Ex. 9 at 6. Ghanayem replied:

> Not off hand only one person. You ... this is the one person that I know that, you know, he's a he's a close friend of mine....

Gov.Ex. 9 at 6. These statements do not reasonably appear to be those of an experienced drug dealer who already had strong connections to his cousin's drug business and who was already interested in pursuing a transaction. Rather, the statements appear to be those of a confused and ambivalent person in over his head. More importantly, these could not reasonably be viewed as the statements of the same person who, according to agent Grant's testimony, two weeks earlier had promptly and eagerly accepted agent Grant's offer to arrange a drug transaction.

Numerous facts about this taped conversation raise reasonable doubts concerning Ghanayem's predisposition. First, Ghanayem was clearly unable or unwilling to contact Shunnarah before the May 7 meeting with agent Grant. Ghanayem was either hesitant to call Shunnarah or he simply could not reach him easily. Ghanayem's reluctance or inability to reach his drug-dealing cousin, even at the request of a customer (Grant) who was giving him a lucrative car repair job, suggests that he had not previously attempted to arrange a drug deal. In addition, Ghanayem had not called the informant or agent Grant in the intervening weeks. The government's tapes establish that Ghanayem initially played a passive and disinterested role in agent Grant's suggested drug transaction, despite Ghanayem's financial interest in accommodating an important car repair customer. Only after agent Grant met with Ghanayem three times, and visited Ghanayem at work twice, did Ghanayem finally follow through by contacting his cousin to set up a drug deal.

Ghanayem's demeanor at this meeting, as reflected on tape, also suggests that he was inexperienced and uneasy in negotiating a drug transaction. During the conversation, Ghanayem twice deflected agent Grant's drug conversation back to car repairs—a subject with which Ghanayem clearly was more comfortable. Nevertheless, Agent Grant repeatedly returned the discussion to cocaine. On the basis of the taped evidence, a reasonable jury would have doubted that Ghanayem's ultimate involvement was due to his own predisposition to engage in a drug deal rather than to agent Grant's tenacity. In light of the taped evidence, agent Grant's testimony regarding Ghanayem's initial eagerness to set up a drug deal cannot reasonably be viewed as substantial evidence sup-

---

7. In reaching this conclusion, the court does not weigh the contradictory testimony (which of course is a jury function). Rather, the court finds that in light of the contradictions between the government's taped evidence and agent Grant's testimony, the government simply did not present sufficient evidence to establish Ghanayem's predisposition beyond a reasonable doubt.

porting a finding of predisposition beyond a reasonable doubt.

Finally, the May 7 tape raises a reasonable doubt whether Ghanayem was interested in buying drugs at all. A reasonable jury listening to the tapes should have concluded that there was a question whether Ghanayem's real interest was in repairing agent Grant's expensive car. Ghanayem testified that most of the cars he fixed were five to seven years old with no warranties. In contrast, agent Grant arrived at the body shop in a $90,000 Mercedes Benz convertible that needed fairly expensive repairs. Tr. at 470. Ghanayem's real predisposition may have been to try to make money through legal channels, i.e., by fixing agent Grant's expensive car. During the May 7 meeting, Ghanayem twice attempted to turn agent Grant's drug-related conversation back to cars generally or auto repairs specifically. Agent Grant persistently returned the discussion to drugs. A rational jury listening to taped evidence in which Ghanayem clearly attempted to deflect the conversation away from drugs would conclude that there is a reasonable doubt about Ghanayem's predisposition: did Ghanayem go along with a drug deal only because he was trying to accommodate a customer who was offering him lucrative car repair work? The jury could not reasonably overlook this direct, undisputed, government-authenticated evidence in favor of agent Grant's contradictory testimony.[8]

#### iv. Later meetings

■ Five days later, on May 12, 1993, agent Grant visited Ghanayem at the body shop. At this meeting, Ghanayem discussed car repairs until agent Grant brought up the subject of drugs. By the time of this meeting, Ghanayem had spoken with Shunnarah and was talking about price and quantity. Gov.Ex. 10 at 5–8. In this and the subsequent meetings, Ghanayem discussed the possibility of multiple deals and requested a $1,000 commission on a $20,000 transaction. Thus, it was reasonable for the jury to conclude that Ghanayem was a willing participant in a drug conspiracy after May 12. However, the May 12 meeting occurred nearly two months after Ghanayem first met

agent Grant, and on agent Grant's third visit to Ghanayem's place of employment. Although Ghanayem ultimately became an active participant in a drug transaction, that fact alone does not support a reasonable inference that he was predisposed to participate or that he was not entrapped initially. See United States v. Evans, 924 F.2d 714, 716 (7th Cir.1991) (if defendant "was indeed entrapped, it is irrelevant that the entrapment was so effective as to make him not only a willing but an eager participant"). There is ample evidence from which to conclude that Ghanayem actively participated in a drug conspiracy after May 12. However, in light of the May 7 tape, which directly shows Ghanayem's disinterest and inexperience in drug transactions, agent Grant's contradictory testimony as to Ghanayem's predisposition does not constitute substantial evidence that Ghanayem was predisposed to arrange a cocaine transaction. The government presented no other evidence of predisposition. Accordingly, there is insufficient evidence upon which the jury could have based a finding beyond a reasonable doubt that Ghanayem was predisposed to participate in a drug sale.

#### d. Recent decisions

The conclusion that there is insufficient evidence to establish predisposition is supported by recent case law. In Jacobson v. United States, —— U.S. ——, ——, 112 S.Ct. 1535, 1541, 118 L.Ed.2d 174 (1992), the Supreme Court ruled that it was improper to find the defendant predisposed to commit an offense in light of a two-year campaign by the government to induce criminal actions. Similarly, in United States v. Groll, 992 F.2d 755, 759 (7th Cir.1993), the Seventh Circuit found that a defendant was entitled to withdraw a guilty plea in light of evidence that a government agent called the defendant every day for a month, acted in a threatening and belligerent manner, and ignored the defendant's protestations that she was too busy to sell him drugs. Finally, in United States v. Hollingsworth, 9 F.3d 593 (7th Cir.1993), the Seventh Circuit ruled that defendants in a

---

**8.** See note 7.

money-laundering operation had been entrapped into committing the crime, in light of evidence that government agents "inveigled" them into the money-laundering scheme. The *Hollingsworth* court found that the defendants "would not have acted had the government not persuaded them to act. The government manufactured a crime; it turned bad thoughts into bad acts." *Hollingsworth,* 9 F.3d at 600.[9]

In each of these cases, the court found that there was a reasonable doubt regarding the defendant's predisposition in light of government pressure to engage in the criminal activity. In *Hollingsworth,* the Seventh Circuit articulated a crucial point about predisposition:

> A reasonable jury could have found [the defendants] "predisposed" if the term refers merely to a psychological state of willingness to break the law. But if the concept of predisposition is to serve the purpose of the doctrine of entrapment, it must mean more—must connote opportunity (what we are calling "readiness") as well as willingness.

*Hollingsworth,* 9 F.3d at 599. In this case, a rational jury listening to the tapes could not have concluded beyond a reasonable doubt that Ghanayem was both willing and ready to engage in drug trafficking before or when he met agent Grant. The taped evidence strongly suggests that agent Grant "manufactured" the transaction—agent Grant persuaded Ghanayem to do something that he likely would not have done otherwise. Upon listening to the tapes, the only evidence supporting a finding that Ghanayem was predisposed to engage in a drug deal was agent Grant's testimony. However, that testimony is seriously called into question by the cold, undisputed facts documented by the government's tapes. Taking the testimony and the tapes together, the government's evidence of predisposition is insufficient.

### e. Conclusion

Based on the evidence presented by the government, a reasonable jury would have found that there is a real question whether the government pressured Ghanayem into negotiations to buy cocaine despite Ghanayem's initial lack of interest or disinclination to be involved in the deal. The government presented no evidence that Ghanayem had been involved in drugs—or any other criminal enterprise—previously. In addition, the government presented evidence that the crime was orchestrated as a reverse buy designed to apprehend not Ghanayem, but his cousin Shunnarah. Finally, the government presented agent Grant's testimony regarding Ghanayem's predisposition. However, agent Grant's testimony was undercut by the government's taped evidence. The government's evidence was insufficient; a rational jury could not have concluded beyond a reasonable doubt that Ghanayem was predisposed to participate in agent Grant's sale of cocaine to Shunnarah.

In light of the government's failure to present sufficient evidence concerning Ghanayem's predisposition, the court finds that as a matter of law there is a reasonable doubt whether Ghanayem would have engaged in criminal activity had he not been repeatedly requested by a government agent to do so. There is a reasonable doubt whether Ghanayem's participation in the cocaine deal was the result of "the creative activity of [government] officials." *Sorrells v. United States,* 287 U.S. 435, 451, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932). The government has failed to establish beyond a reasonable doubt that Ghanayem was predisposed to participate in a drug conspiracy. Accordingly, Ghanayem's conviction must be vacated.

### 4. Other Challenges

In light of the finding that Ghanayem's conviction must be vacated because of insufficient evidence of predisposition, it is not necessary to address Ghanayem's other chal-

---

**9.** In many earlier decisions, the Seventh Circuit has upheld convictions in the face of entrapment challenges. However, in these decisions, the Seventh Circuit placed an initial burden on the defendant to prove that he was not predisposed to commit the offense. *See, e.g., United States v. Rivera–Espinoza,* 905 F.2d 156, 158 (7th Cir. 1990). The Supreme Court's *Jacobson* decision overruled these cases.

lenges to his conviction or his motion for a new trial.

## CONCLUSION

Defendant Khadir Ghanayem's motion for reconsideration of the denial of his motion for judgment of acquittal is granted. The guilty verdict on Count I of the indictment is vacated. Any bond Ghanayem posted is exonerated.