. UNITED STATES of America, Plaintiff–Appellant,

v.

Christ THEODOSOPOULOS and Khadir Ghanayem, Defendants–Appellees.

UNITED STATES of America, Plaintiff–Appellee,

. v.

Khadir GHANAYEM, Defendant–Appellant.

Nos. 93–3831, 94–1384 and 94–2417.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1995.

Decided Feb. 28, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied April 18, 1995.

Steven Shobat, Asst. U.S. Atty., Bennett Kaplan (argued), Office of U.S. Atty., Crim. Div., Barry Rand Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for U.S.

Victor F. Ciardelli (argued), Peter J. Vilkelis, Chicago, IL, for Christ Theodosopoulos.

David S. Mejia (argued), Stephen K. Milott, Stephen K. Milott & Associates, Chicago, IL, for Khadir Ghanayem.

Before FLAUM and EASTERBROOK, Circuit Judges, and PAINE,* District Judge.

FLAUM, Circuit Judge.

A jury convicted defendants Khadir Ghanayem and Christ Theodosopoulos of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1),

---

* The Honorable James C. Paine, of the United States District Court for the Southern District of Florida, sitting by designation.

846, and 18 U.S.C. § 2. After trial, the district court granted both defendants' motions for judgment of acquittal pursuant to Fed.R.Crim.P. 29, concluding that the government had entrapped Ghanayem and had failed to prove that Theodosopoulos was a knowing participant in the conspiracy. The district court also denied Ghanayem's motion for a new trial pursuant to Fed.R.Crim.P. 33. The government appeals the district court's judgment of acquittal and Ghanayem appeals the denial of his motion for a new trial. We now reverse the judgments of acquittal, affirm the denial of Ghanayem's new trial motion, reinstate the jury verdicts, and remand for sentencing.

## I.

In March, 1993, as part of a Drug Enforcement Administration ("DEA") investigation, an individual cooperating with the DEA initially identified several people who were allegedly known drug dealers, and a location—the One, Two, Three Lounge in Chicago—where these persons congregated. On March 30, 1993, undercover DEA Special Agent William Grant and the informant went to this lounge and met defendant Khadir Ghanayem. The informant recognized Ghanayem as a cousin and drug associate of Mazen Shunnarah, one of the targets of the investigation. During the course of their conversation, Ghanayem handed the informant his business card and told him to contact him at his work at George's Auto Shop ("George's") if he needed anything.

On April 22, 1993, the informant and Grant met Ghanayem at George's. Although Grant attempted to make an audio tape of the conversation, the recording was virtually inaudible. Grant testified that they first discussed replacing a windshield on Grant's Mercedes Benz. During the conversation, the informant asked Ghanayem if he was interested in "buying anything," apparently alluding to drugs. When Ghanayem asked what Grant had available, Grant responded that he had "five keys"—referring to five kilograms of cocaine. Grant testified that Ghanayem asked about the price and that Grant told Ghanayem that he could purchase cocaine for $20,000 per kilogram. Grant also

testified that Ghanayem stated that he would call the informant the next day, although no such call was made. In contrast to Grant's version of the events, Ghanayem testified that Grant brought up the cocaine and a potential deal, to which Ghanayem responded that he did not buy, sell, or do drugs.

The next contact occurred on May 7, 1993, when Grant again went to George's. Grant testified that along with discussing his car windshield, Ghanayem stated that he had not yet reached his cocaine contact, who he referred to as "Mazen." Grant gave Ghanayem his pager number and agreed on the code "111" for future contacts. Records indicate that calls were placed using Ghanayem's cellular telephone to Shunnarah's tavern in Lexington, Kentucky on May 11, 1993.

On May 12, 1993, Grant and Ghanayem met again at George's. Grant testified that Ghanayem informed him that he had a purchaser who wanted three kilograms of cocaine at $20,000 per kilogram. Grant also testified that when asked when his contact would be ready, Ghanayem made a long distance telephone call to area code 606—which includes Lexington—asked for "Mazen," and then had a brief conversation with Mazen Shunnarah. Ghanayem then told Grant that he (Ghanayem) would purchase one kilogram of cocaine, that Mazen would purchase three more, and that they would contact Grant when they were ready to make the purchase.

The next meeting between Ghanayem and Grant took place on May 17, 1993. After discussing arrangements for fixing the Mercedes Benz, Ghanayem informed Grant that he had been having trouble reaching his contact and that he would continue to try to call him. Ghanayem's cellular telephone records indicate that telephone calls were again placed to Shunnarah's tavern in Lexington on May 18, 1993. On the morning of May 20, 1993, Grant dropped off his car at the shop. He testified that later that afternoon Ghanayem paged him, using the agreed-upon "111" code. Grant testified that he returned to the auto shop, where he observed a light blue Audi, and met with Ghanayem and Shunnarah. Grant then testified that Ghanayem told him that he did not want to be involved in the negotiations with Shunnarah

but that he wanted Grant to add $1,000 to the purchase price for him. Grant, Ghanayem and Shunnarah then drove around the area in Shunnarah's Audi, discussing Ghanayem's search for a consistent source of cocaine. Shunnarah and Grant agreed on a price of $21,000 per kilogram and on meeting at the auto shop to complete the deal.

Later that evening, Grant and Ghanayem changed the transaction meeting location to the Plush Pup restaurant at 8:30 p.m. Grant drove to the restaurant with Special Agent Bernie Bolf, who had brought the 5 kilograms of cocaine in the trunk of his car. Shunnarah told Grant that he had the money but that he first wanted to see the cocaine. Grant and Shunnarah walked to Bolf's trunk, where Shunnarah examined one of the kilogram packages of cocaine and concluded "that would be fine." Shunnarah told Grant that he would return in ten minutes with the money. While Grant and Ghanayem waited inside the restaurant for Shunnarah to return, they received a phone call from Shunnarah stating that the person with the money for the cocaine would not give him the money until he saw the cocaine. Grant, Ghanayem, and Shunnarah agreed that they would go to the A to Z Auto Body in River Grove where they could meet the money source.

At the Body Shop, Grant testified that he saw Shunnarah and fifteen unknown males. Grant indicated that Shunnarah told him that the purchaser of the cocaine, who he pointed to and identified as "Chris," would not deliver the $21,000 purchase money until he saw the cocaine.[1] Grant, saying that he did not do business this way, refused to show the cocaine, and left the shop. As Grant was leaving, Shunnarah approached him and told him that he would drive to Lexington and get his own money to purchase five kilograms of cocaine. The following day, Grant met with Ghanayem at George's to discuss the repair of Grant's windshield and paid Ghanayem $450 for the repairs. During that meeting,

Grant testified that he complained about the dealings the previous evening.

On May 22, 1993, Ghanayem called Grant and told him that they were ready to complete the deal. Grant stated that he could not do it until the next day. The following day, May 23,[2] Ghanayem contacted Grant and told the agent to meet him in the parking lot of Chicago Billiards on Irving Park Road at 10:30 a.m. At approximately 11:00 a.m., Grant met Ghanayem and Shunnarah, who told the officer that he was having a difficult time waking up the individual with the money, who Shunnarah identified by the name "Chris." Telephone records from Ghanayem's cellular phone indicate that two one-minute calls were made to Theodosopoulos's residence at 11:46 a.m. and 12:13 p.m. A single call was placed at 12:30 p.m. from Theodosopoulos's phone to Ghanayem's cellular phone.

After this meeting, Ghanayem and Shunnarah drove from the parking lot to the Resurrection Hospital, where Ghanayem had a foreign object removed from his eye. Ghanayem and Shunnarah then drove to an alleyway, where they stopped at a garage behind Theodosopoulos's residence. Here, Special Agents Jeff Hall and William Krieg observed Ghanayem and Shunnarah speaking with a number of individuals, one of whom matched the physical description of Theodosopoulos. Ghanayem testified that he took each of these actions only after repeated pressure from Grant.

At approximately 1:00 p.m., Shunnarah paged Grant, told him that the individual with the money was ready to complete the deal and that they would once again meet him at the Chicago Billiards's parking lot. When Grant arrived, he observed Shunnarah's car (containing both Ghanayem and Shunnarah) parked next to a gray Nissan 300 ZX. Grant parked next to Ghanayem and asked to see the money. At that moment, the gray Nissan drove in front of Grant's car. Grant recognized the car's passenger as

---

1. The individual to whom Grant pointed subsequently was identified as co-defendant Christ Theodosopoulos.

2. Ghanayem testified to an entirely different version of the events. He testified that on May 23,

Grant again proposed the cocaine deal, to which Ghanayem responded: "I don't do drugs, I don't want any drugs, don't bring no drugs by my business and I wasn't involved in any drugs."

Theodosopoulos. Theodosopoulos held up a stack of money and waved it so Grant could see it. Theodosopoulos then drove out of the parking lot and Shunnarah asked for the cocaine. Grant contacted undercover Agent Hall who, upon arrival, asked Shunnarah to have his people return with the money so they could count it. Shunnarah refused and told Grant that he would instead get his own money from Kentucky and purchase the cocaine himself.

Ghanayem and Theodosopoulos were subsequently arrested and charged in a two-count indictment for conspiracy to possess with intent to distribute cocaine and attempt to possess with intent to distribute cocaine. A jury trial began on October 13, 1993. At the close of the government's case, both defendants moved for directed findings of not guilty and judgments of acquittal. The district court denied both defendants' motions. Theodosopoulos then rested without testifying or presenting any evidence. Ghanayem presented a defense, including testifying on his own behalf.

After Ghanayem rested, he sought to enter into evidence a plea agreement between Shunnarah and the United States. Mazen Shunnarah had been indicted in Lexington, Kentucky and charged with conspiring to possess cocaine with intent to distribute. Pursuant to a written plea agreement with the United States Attorney's Office in Lexington, he had entered a guilty plea. Under the terms of this agreement, which did not expressly bind the United States Attorney's Office in the Northern District of Illinois, Shunnarah was obligated to cooperate with the United States. The government did not call Shunnarah as a witness in the trial. When Ghanayem called Shunnarah to the stand, however, Shunnarah exercised his Fifth Amendment right not to testify. The government informed the court that Shunnarah had made statements that were favorable to the defense-specifically, that Ghanayem had never been involved in a drug deal before. As a result, the court ordered a missing witness instruction. The court advised the jury: (1) that Shunnarah had entered a guilty plea in Lexington, Kentucky; (2) that he was obligated under the terms of that plea

agreement to cooperate with the government and tell the truth; and (3) that Shunnarah was in the exclusive control of the government and that the failure to call Shunnarah to the witness stand permitted the jury to infer that his testimony would have been unfavorable to the government. In his closing argument, Ghanayem argued this inference to the jury and suggested that Shunnarah, the sole wrongdoer, would have exculpated Ghanayem. The defendants renewed their motions for judgments of acquittal at the close of all the evidence. The district court expressly reserved ruling on the motions, under Fed.R.Crim.P. 29, until after the jury reached verdicts.

On October 20, 1993, the jury found Ghanayem and Theodosopoulos not guilty of the attempt count and guilty of the conspiracy charge. The district court initially denied Ghanayem's oral motion for a new trial and for acquittal; after consideration of written motions, however, the district court granted Ghanayem's post-trial motion for acquittal under Fed.R.Crim.P. 29, *United States v. Ghanayem*, 845 F.Supp. 556 (N.D.Ill.1994), on the ground that the government had entrapped Ghanayem. The government then filed a motion, pursuant to Fed.R.Crim.P. 29(d), seeking a conditional ruling on the pending motion for a new trial. Pursuant to the government's request, the district court denied Ghanayem's new trial motion, founded on the grounds of new evidence. The district court then also granted Theodosopoulos's motion for judgment of acquittal for lack of evidence, and set aside both jury verdicts.

The government now appeals both judgments of acquittal. Ghanayem challenges the district court's denial of his motion for a new trial.

## II. Khadir Ghanayem

### A.

With regard to Ghanayem's directed judgment of acquittal, the government raises only one issue on appeal: the sufficiency of the evidence to support the jury's conclusion that Ghanayem was a knowing member of the charged conspiracy and was not entrapped as a matter of law. The standard

for appellate review of a trial court's post-verdict judgment of acquittal is the same as that applied by the trial court. *United States v. Beck*, 615 F.2d 441 (7th Cir.1980); *see United States v. Brennan*, 994 F.2d 918, 922 (1st Cir.1993). The test is whether the record contained sufficient evidence from which the jury could reasonably find the defendant guilty beyond a reasonable doubt. We view the evidence in the light most favorable to the government, recognizing that it is the exclusive function of the jury to determine the credibility of witnesses and draw reasonable inferences. *United States v. Douglas*, 874 F.2d 1145, 1155 (7th Cir.), *cert. denied*, 493 U.S. 841, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989). The defendant "bears a heavy burden on appeal, as he must demonstrate that no rational trier of fact could decide beyond a reasonable doubt that he was not entrapped." *United States v. Cervante*, 958 F.2d 175, 178 (7th Cir.1992). "Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *United States v. Whaley*, 830 F.2d 1469, 1473 (7th Cir.1987), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *United States v. Atterson*, 926 F.2d 649, 655 (7th Cir.), *cert. denied*, 501 U.S. 1259, 111 S.Ct. 2909, 115 L.Ed.2d 1072 (1991).

■ In entrapment cases, the government must prove beyond a reasonable doubt that a defendant who raises a colorable defense of entrapment, as Ghanayem did, has not in fact been entrapped. *United States v. Hollingsworth*, 27 F.3d 1196, 1203 (7th Cir. 1994) (*en banc*) (citing *Jacobson v. United States*, 503 U.S. 540, 547–49, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992)). The defense of entrapment consists of two elements: (1) government inducement of the crime; and (2) a lack of predisposition on the part of the defendant to engage in criminal conduct. *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886–87, 99 L.Ed.2d 54 (1988); *United States v. Gootee*, 34 F.3d 475, 477 (7th Cir.1994); *United States v. Johnson*, 32 F.3d 304, 307 (7th Cir.1994). The lack of predisposition is the principal element in the entrapment defense. *Johnson*, 32 F.3d at 307 (citing *United States v. Russell*, 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973); *United States v. Evans*, 924 F.2d 714, 717 (7th Cir.1991)). Moreover, once the defendant presents sufficient evidence tending to show that the government induced him to break the law, the burden shifts to the government to prove beyond a reasonable doubt that the defendant was disposed to commit the crime prior to being approached by government agents. *Jacobson*, 503 U.S. at 547–49, 112 S.Ct. at 1540; *United States v. Ellis*, 23 F.3d 1268, 1272 (7th Cir.1994); *United States v. Groll*, 992 F.2d 755, 759 (7th Cir. 1993).[3]

■ "Predisposition focuses on whether the defendant was an unwary innocent or, instead, an unwary criminal who readily avails himself of the opportunity to perpetrate the crime." *Johnson*, 32 F.3d at 307 (quoting *Mathews*, 485 U.S. at 63, 108 S.Ct. at 886–87) (internal quotations omitted). This Court looks to five factors to determine whether the defendant had the predisposition to commit the charged offense: (1) the character or reputation of the defendant; (2) whether the suggestion of criminal activity was originally made by the government; (3) whether the defendant was engaged in criminal activity for a profit; (4) whether the defendant evidenced a reluctance to commit the offense, overcome by government persuasion; and (5) the nature of the inducement or persuasion offered by the government. *Johnson*, 32 F.3d at 307, n. 5 (citing *United States v. Haddad*, 976 F.2d 1088, 1095 (7th Cir.1992)); *Hollingsworth*, 27 F.3d at 1205 n. 1 (Coffey, J., dissenting); *United States v. Gonzalez*, 19 F.3d 1169, 1172 (7th Cir.1994); *United States v. Santiago–Godinez*, 12 F.3d 722, 728 (7th Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 1630, 128 L.Ed.2d 354 (1994). The most important factor is whether the defendant exhibited a reluctance to commit the offense that government agents over-

---

3. We also note that where there is sufficient evidence that a defendant is predisposed to commit the crime, we do not need to inquire into government inducement. *Johnson*, 32 F.3d at 308.

came. *Johnson*, 32 F.3d at 307 n. 5 (citing *Santiago–Godinez*, 12 F.3d at 728).

"Generally ... the question of entrapment is one for the jury, rather than for the court." *Johnson*, 32 F.3d at 307. Although Fed. R.Crim.P. 29 permits a court to direct a verdict of acquittal where there is "no evidence" from which a jury could find guilt beyond a reasonable doubt, *see Whaley*, 830 F.2d at 1473, in cases where there is at least some evidence in the record, it is for the jury to decide questions of fact, to weigh conflicting testimony, to draw reasonable inferences from the evidence and to make credibility determinations. The jury must examine the evidence as a whole (including trial testimony and tape recordings), assess its weight and reliability, and resolve contradictions in favor of either side. This is especially true in the entrapment context, for whether "entrapment occurred is a factual issue; 'the defense ... is intertwined with the issue of intent and is often based on credibility determinations, which are traditionally reserved for jury resolution.'" *Johnson*, 32 F.3d at 307 (quoting *Santiago–Godinez*, 12 F.3d at 727).

The district court, however, concluded that the evidence introduced at trial established beyond a reasonable doubt, as a matter of law, that the government had entrapped Ghanayem. In granting Ghanayem's Rule 29 motion, the district court stated:

> Taking [Grant's] testimony in a vacuum, the jury was presented with sufficient evidence upon which to find that Ghanayem was predisposed to arrange a cocaine deal. However, the testimony of agent Grant and Ghanayem must be considered together with the unimpeached taped recorded conversations introduced by the government. These tapes, which the government

introduced as authentic representations of later recorded conversations, effectively undercut the weight and reliability of agent Grant's testimony about Ghanayem's behavior at the earlier meetings. In light of the tapes, the government's evidence was insufficient to support a finding of predisposition.

845 F.Supp. at 561. In reaching this conclusion, the district court examined the government's predisposition evidence. It first determined that the government had presented no evidence that Ghanayem had ever been involved in, arrested for, or convicted of any drug offense, or that Ghanayem had anything to do with illegal drug trafficking. Second, the court found that the government had initiated negotiations with Ghanayem. The court then examined the government's other evidence, including the taped conversations between Ghanayem and Grant, and concluded that the government had not presented sufficient circumstantial evidence to support a finding of Ghanayem's predisposition. *Id.* at 562–63. We disagree.

The district court relied heavily on what it considered conflicting testimony regarding Ghanayem's responses to Grant's contact with him. The court determined that the taped conversations introduced by the government not only showed Ghanayem as unwilling to participate [4] but also showed Grant's testimony to be of "questionable reliability and accuracy." [5]

Examining all the evidence in the record in the light most favorable to the government, we conclude that the government presented sufficient evidence to permit a jury to determine beyond a reasonable doubt that Ghanayem had the requisite predisposition. By

---

4. Agent Grant testified that during the meeting on May 7, Ghanayem accepted Grant's offer to arrange a drug transaction. The district court points to several moments in the taped conversation which, the court opines, indicate Ghanayem's reluctance to engage in the transaction. First, in response to Grant's inquiry about Ghanayem's contact with Shunnarah, Ghanayem stated: "He never called me, I was wanting a ... wasn't able to get a hold of me, he couldn't get a hold of it." Later, when asked if he knew anyone else who might be interested in purchasing drugs, Ghanayem replied: "Not off hand only one person. You ... this is the one person that I

know that, you know, he's a he's a close friend of mine...." The district court indicates that Ghanayem's stammering responses reflect a confused and ambivalent person reluctant to be involved in the cocaine deal, rather than the reactions of an experienced drug dealer.

5. The district court, in a footnote, contends that it is not weighing the testimony, which it admits is a jury function, but rather is concluding that the government did not present sufficient evidence to establish predisposition.

reason of Ghanayem's previous experiences and acquaintances, it is "likely that if the government had not induced him to commit the crime, some criminal would have done so." *Hollingsworth*, 27 F.3d at 1200. We reach this conclusion on the basis of the five factor test this Court follows.

First, the government proffered evidence that Ghanayem's character and reputation predisposed him to being involved in a drug transaction. The district court concluded that "[t]he government presented no evidence that Ghanayem had ever been involved in, arrested for, or convicted of any drug offense." 845 F.Supp. at 559. A review of the trial record, however, leads us to a different conclusion. Although Ghanayem had no previous cocaine-related offenses, Agent Grant testified that Ghanayem had a previous marijuana conviction.[6] Furthermore, Ghanayem used terminology that indicated he was experienced in the drug trade. *See Johnson*, 32 F.3d at 308; *Cervante*, 958 F.2d at 179 (ease in communicating in drug dealing jargon is relevant in examining character and reputation); *United States v. Rivera–Espinoza*, 905 F.2d 156, 158 (7th Cir.1990) (defendant's use of drug business terms of art evidenced his knowledge of the drug trade). Ghanayem also showed his awareness of the usual course of dealings in drug transactions. On May 20, 1993, Ghanayem informed Grant that although he did not want to participate directly in the negotiations between Grant and Shunnarah, he wanted Grant to add $1,000 to the price of each kilogram of cocaine sold (which Grant would pass along to Ghanayem as a finder's fee). This insistence on $1,000 per kilogram sold to Shunnarah indicates that Ghanayem was aware of the range for a broker's fee for bringing together a supplier and distributor of cocaine. *See Santiago–Godinez*, 12 F.3d at 729–30 ($2,000 per kilogram fee is not extraordinary). He thus indicated his "sophistication and knowledge of the drug business," *United States v. Perez–Leon*, 757 F.2d 866, 872 (7th Cir.), *cert. denied*, 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985); *United States v. Beverly*, 913 F.2d 337, 355 (7th Cir.1990), *cert. denied*, 498 U.S. 1052, 111 S.Ct. 766, 112 L.Ed.2d 786 (1991), and "demonstrated that [he] was 'not unfamiliar with the business for which' [he] was convicted by using terms of art." *Beverly*, 913 F.2d at 355 (internal punctuation omitted).

 The second factor is not in dispute. The government concedes that on April 22, 1993, it approached Ghanayem, made the initial contact and suggested the drug deal. While this factor does support Ghanayem's case, "mere solicitation by a government agent is insufficient to establish entrapment." *Johnson*, 32 F.3d at 308; *Cervante*, 958 F.2d at 179; *United States v. Blackman*, 950 F.2d 420, 424 (7th Cir.1991); *Perez–Leon*, 757 F.2d at 872.

The third factor favors the government in that the record reflects that Ghanayem engaged in criminal activity for a profit. In fact, it appears that the singular purpose of Ghanayem's involvement in the drug transaction was to profit. Grant testified that from the outset, Ghanayem maintained a "what's-in-it-for-me" attitude and insisted on his piece of the action. As discussed above, Ghanayem wanted $1,000 per kilogram of cocaine as a profit on sales to Shunnarah. Record testimony also indicates that Ghanayem repeatedly stressed the importance of the $1,000 and wanted to prevent any direct contact between him (Ghanayem) and Shunnarah in order to insure he received this broker's fee. Viewing the evidence in the light most favorable to the government, we recognize that a jury could reasonably have concluded that "a person who operates in a chain of cocaine distribution does not do so at a financial loss," *Beverly*, 913 F.2d at 356; *Perez–Leon*, 757 F.2d at 872, and that Ghanayem sought to profit from the drug transaction.

The fourth, and most important factor, also favors the government. It was reasonable for the jury to conclude that the defendant did not express reluctance which government persuasion overcame. While Ghanayem

---

6. The district court noted that Grant had given "unsubstantiated" testimony that Ghanayem had a prior marijuana possession arrest. 845 F.Supp. at 559 n. 2. Agent Grant actually testified that, although he was uncertain as the specifics, Ghanayem had a previous marijuana *conviction*.

maintains that he informed Grant that he did not buy, sell or deal in drugs, Grant testified that Ghanayem did not express any reluctance at becoming involved and serving as a middleman. Furthermore, the record is void of any evidence that Ghanayem was cajoled into the conspiracy. Rather, Grant approached Ghanayem with the opportunity not only to provide Shunnarah with a source of cocaine, but also to make a considerable profit (for minimal effort). Grant's testimony concerning his contacts with Ghanayem demonstrates that Ghanayem was willing and eager to participate in a drug transaction and, with the exception of Ghanayem's own testimony, the record is devoid of any evidence suggesting that Ghanayem was reluctant to participate.

Ghanayem remained an enthusiastic and active participant in the conspiracy. Throughout the course of the dealings, Ghanayem did not abandon the transaction when it encountered trouble spots; to the contrary, Ghanayem expressed his willingness to pursue the transaction. On May 7, 1993, Ghanayem informed Grant that he could not reach his contact, but that he would continue to try to reach him that evening. On May 12, when Grant inquired as to when Ghanayem's contact would be ready, Ghanayem told Grant that he would find out right away. On May 17, Ghanayem told Grant that although he had been unable to reach his contact, he would continue his communication efforts. Again, on May 19, Ghanayem noted his difficulty in reaching his contact but reassured Grant that he would try to call him later.

Once the transaction was off and running, Ghanayem expressed in his numerous meetings with Grant neither reluctance at being involved nor the desire to get out. On May 20, Ghanayem drove around with Grant and Shunnarah, working out the details of the transaction. He was directly involved in setting up the time and place for the deal to be fully completed. On May 21, even after Grant had direct contact with Shunnarah, Ghanayem was instrumental in attempting to complete the deal. On May 23, Ghanayem again was the pivotal figure in setting up each aspect of the deal. He remained in constant contact with Grant and, with Shun-

narah, communicated with Theodosopoulos. Ghanayem was present in the Chicago Billiard's parking lot when the cocaine for money transaction was to occur and when Theodosopoulos flashed the money at Grant.

Fifth, the nature of the government's inducement and persuasion do not support Ghanayem's entrapment theory. The government did not threaten, intimidate or coerce Ghanayem. They did not spend over two years pressuring him into this transaction, as in *Jacobson*, nor a year, as in *Hollingsworth*. Rather, the government's interaction with Ghanayem merely stretched over the course of three months and nine meetings. The government did not offer any special inducements or promises to Ghanayem. Although Ghanayem contends that the legitimate car repair transaction created pressure on him to continue a relationship with Grant, when viewed in light of his $1,000 per kilogram profit, it was reasonable for the jury to conclude that this was not actually a coercive factor. Ghanayem stood to make at least $5,000 ($1,000 for each of 5 kilograms) for the cocaine—a far greater profit than he would net from the car repairs. Finally, even if we were to credit Ghanayem's testimony, the $450 was not overly large, and "[w]hen a person accepts a criminal offer without being offered extraordinary inducements, he demonstrates a predisposition to commit the type of crime involved." *Evans*, 924 F.2d at 718; *see Cervante*, 958 F.2d at 180.

Thus, it was reasonable for the jury to have concluded that Ghanayem was in a "position without the government's help to become involved in illegal activity." *Hollingsworth*, 27 F.3d at 1200. Although Ghanayem may not have otherwise become involved in the drug conspiracy at that particular moment in time, the government sufficiently proved that he was predisposed to commit the crime at some point. In this case, the government's involvement may have affected the timing of the offense; it did not force the offense. Based on our review of the record, and in light of the five factors discussed above, we conclude that there was more than enough evidence to support the jury's conclusion that Ghanayem was predisposed to con-

spire to possess with the intent to distribute cocaine and, as such, was not entrapped. "We will not disturb the jury's credibility determinations unless it credits exceedingly improbable testimony," *Cervante*, 958 F.2d at 108 (citing *United States v. Jones,* 950 F.2d 1309, 1315 (7th Cir.1991), *cert. denied,* 503 U.S. 996, 112 S.Ct. 1700, 118 L.Ed.2d 410 (1992); *United States v. Cardona–Rivera,* 904 F.2d 1149, 1152–53 (7th Cir.1990)), and such is not the case here.

**B.**

■ Ghanayem also argues that the district court erred in denying his motion for a new trial. He contends that he was entitled to a new trial based upon newly discovered evidence which demonstrates that he was not predisposed to commit the crime. Specifically, Ghanayem maintains that after the trial, Mazen Shunnarah would have provided testimony, previously unavailable, which would have exculpated Ghanayem.

The government brought Shunnarah to the Northern District of Illinois under subpoena. In Shunnarah's initial interview with the government, he admitted that he had attempted to purchase the five kilograms of cocaine from Grant, that Ghanayem had arranged the contact, that Ghanayem was to receive a percentage of the profits, and that Theodosopoulos was providing a portion of the purchase money. Closer to the trial date, Shunnarah changed his story and withdrew his statements regarding Theodosopoulos's involvement. Because of these differing stories, the government did not call Shunnarah as a witness. Ghanayem did call Shunnarah as part of his defense. Although Shunnarah had already pled guilty in Lexington, he had not yet been sentenced. Shunnarah thus refused to testify, exercising his Fifth Amendment right against self incrimination.

We will reverse a district court's denial of a motion for a new trial based on newly discovered evidence only if the district court has abused its discretion. *Gootee,* 34 F.3d at 479; *United States v. DePriest,* 6 F.3d 1201,

1216 (7th Cir.1993). "We approach such motions with great caution and are wary of second-guessing the determinations of both judge and jury." *DePriest,* 6 F.3d at 1216; *United States v. Kamel,* 965 F.2d 484, 490 (7th Cir.1992).

■ Rule 33 of the Federal Rules of Criminal Procedure provides that "[t]he court on motion of a defendant may grant a new trial to that defendant if required in the interests of justice." To justify a new trial based on newly discovered evidence, Ghanayem must satisfy a stringent multi-stage test. *United States v. Young,* 20 F.3d 758, 763 (7th Cir.1994). He must show that the evidence: (1) came to his knowledge only after trial; (2) could not have been discovered sooner through the exercise of due diligence; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a new trial. *Gootee,* 34 F.3d at 479; *DePriest,* 6 F.3d at 1216–17.

Ghanayem fails to satisfy either of the first two prongs.[7] First, Ghanayem has not established that the evidence came to his knowledge only after trial. To the contrary, Ghanayem and his counsel knew during trial the substance of Shunnarah's testimony. Prior to the commencement of trial, defense counsel interviewed Shunnarah. At trial, counsel for Ghanayem explicitly stated that "when [Shunnarah] took the stand he would have said that Shunnarah [sic Ghanayem] had *nothing to* do with the deal, that Chris [Theodosopoulos] had nothing to do with the deal, that he was doing the deal with Grant himself.... I interviewed Mr. Shunnarah.... he told us those things." *See United States v. Ellison,* 557 F.2d 128, 133 (7th Cir.) ("the facts alleged in support of a motion for a new trial were within the defendant's knowledge at the time of trial" and therefore not newly discovered), *cert. denied,* ── U.S. ──, 113 S.Ct. 332, 121 L.Ed.2d 250 (1992). Other courts have also held that this kind of post-trial testimony does not qualify as newly discovered evidence. *See United States v. Dale,* 991 F.2d

---

**7.** Although Ghanayem's failure to satisfy *any* of the prongs precludes his obtaining a new trial, we nonetheless discuss his failure to satisfy the first two. We do not address whether Shunnarah's testimony was material and exculpatory nor whether it would probably lead to an acquittal in the event of a retrial.

819, 838 (D.C.Cir.1993), *cert. denied,* ——— U.S. ———, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993); *United States v. Reyes–Alvarado,* 963 F.2d 1184, 1188 (9th Cir.), *cert. denied,* ——— U.S. ———, 113 S.Ct. 258, 121 L.Ed.2d 189 (1992); *United States v. Munoz,* 957 F.2d 171, 173 (5th Cir.), *cert. denied,* ——— U.S. ———, 113 S.Ct. 332, 121 L.Ed.2d 250 (1992); *Blissett v. LeFevre,* 924 F.2d 434, 441 & n. 1 (2d Cir.), *cert. denied,* 502 U.S. 852, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991); *United States v. Lockett,* 919 F.2d 585, 591 (9th Cir.1990).

Ghanayem also fails to meet the second prong of the test. In order to satisfy this element, Ghanayem would have to show that he could not have discovered the relevant evidence despite the exercise of due diligence. *Kamel,* 965 F.2d at 492–93. Even if we assume (however unlikely it may be) that Ghanayem had no knowledge of Shunnarah's potential testimony, Ghanayem cannot demonstrate that he exercised the requisite "due diligence." He took no steps to secure Shunnarah's testimony. Rather, Ghanayem chose another strategy: give a missing witness instruction and then argue forcefully to the jury the substance of Shunnarah's missing testimony. That Ghanayem's trial tactics failed is not grounds for a new trial. As a result, the district court did not abuse its discretion in denying Ghanayem's motion for a new trial.[8]

### III. Christ Theodosopoulos

■ In appealing the district court's directed judgment of acquittal of Theodosopoulos, the government contends that the evidence introduced at trial was sufficient to support a rational jury's conclusion that beyond a reasonable doubt Theodosopoulos conspired to possess cocaine with the intent to distribute it. In granting Theodosopoulos's motion for a judgment of acquittal, the district court concluded:

> I find the evidence is insufficient to establish beyond a reasonable doubt that Mr. Theodosopoulos was part of the drug conspiracy that is alleged at the indictment.... [A]t the close of the government's case ... I expressed specific concerns about the lack of evidence as to Mr. Theodosopoulos and the difficulty I had even with respect to drawing all reasonable inferences in the government's favor after the government rested.

> I was concerned about the sparsity of the evidence and the equivocal nature of the evidence.... I am convinced that a rational jury could not convict Christ Theodosopoulos of Count I of the indictment beyond a reasonable doubt.

The government first argues that the evidence established the existence of a cocaine conspiracy. Second, the government maintains that Theodosopoulos was a knowing member of that conspiracy who participated in and intended to advance the ends of that conspiracy.

■ In examining a sufficiency of the evidence claim, we review the record in the light most favorable to the government, and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Billops,* 43 F.3d 281 (7th Cir.1994); *United States v. Howell,* 37 F.3d 1197, 1201 (7th Cir.1994); *United States v. Byerley,* 999 F.2d 231, 234 (7th Cir.1993). When reviewing the conviction, we may accept any adequate evidence, including circumstantial evidence, as support for a conviction. *United States v. Baskin–Bey,* 45 F.3d 200 (7th Cir.1995); *United States v. Durrive,* 902 F.2d 1221, 1229 (7th Cir.1990). A jury conviction should be taken away "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Rosalez–Cortez,* 19 F.3d 1210, 1215 (7th Cir.1994).

■ To prove Theodosopoulos guilty of a drug conspiracy, the government must prove beyond a reasonable doubt: (1) a conspiracy existed; (2) Theodosopoulos knew of the conspiratorial agreement; and (3) Theodosopou-

---

**8.** The government contends that Ghanayem waived any argument based on newly discovered evidence. Everything that the government identifies as waiver is more appropriately addressed under the "due diligence" prong of the test. *See Kamel,* 965 F.2d at 493.

los intended to join it. *United States v. James,* 40 F.3d 850, 864 (7th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 948, 130 L.Ed.2d 891 (1995); *United States v. Crowder,* 36 F.3d 691, 695 (7th Cir.1994) ("To sustain a conspiracy charge, the government need only prove the existence of the conspiracy and a participatory link with the defendant.") (quoting *United States v. Blas,* 947 F.2d 1320, 1325 (7th Cir.1991), *cert. denied,* 502 U.S. 1118, 112 S.Ct. 1234, 117 L.Ed.2d 468 (1992)), *cert. denied,* — U.S. —, 115 S.Ct. 1160, 130 L.Ed.2d 1116 (1995); *United States v. Campbell,* 985 F.2d 341, 344–45 (7th Cir.1993).

Without question, there is adequate evidence in the record that a cocaine conspiracy existed. Indeed, the district court did not conclude otherwise; rather the court entered a judgment of acquittal for Theodosopoulos, because of the lack of evidence that he was part of that conspiracy. Neither party has appealed the finding of a conspiracy and we thus accept it.

 The record contained sufficient evidence for the jury to find that Theodosopoulos was a knowing member of the conspiracy.[9] To prove that a particular defendant was a member of an ongoing conspiracy, the government must present "substantial evidence that [the] defendant knew of the illegal objective of the conspiracy and agreed to participate in its achievement." *James,* 40 F.3d at 865 (quoting *United States v. Burrell,* 963 F.2d 976, 987 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992)). Although the jury may not rest its verdict solely by piling inference upon inference, *United States v. Martinez,* 937 F.2d 299, 304 (7th Cir.1991), the government may prove Theodosopoulos's participatory link to the conspiracy solely by way of circumstantial evidence. *United States v. Townsend,* 924 F.2d 1385, 1390 (7th Cir.1991). Thus, while mere presence is not enough by itself to convict a defendant, *see United States v. Cochran,* 955 F.2d 1116, 1123 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 460, 121 L.Ed.2d 368 (1992), this presence, along with

other evidence indicating that the presence or act was intended to advance the ends of the conspiracy, suffices. *See United States v. Carson,* 9 F.3d 576, 587 (7th Cir.1993), *cert. denied,* — U.S. —, 115 S.Ct. 135, 130 L.Ed.2d 77 (1994); *Cochran,* 955 F.2d at 1123 ("[p]resence or a single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the conspiracy"); *United States v. Simone,* 931 F.2d 1186, 1193 (7th Cir.), *cert. denied,* 502 U.S. 981, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991).

Theodosopoulos's presence at the automobile body shop garage on May 20, 1993, at the time set for the first planned exchange of money and cocaine, supports the government's contention that the defendant was a knowing member and active participant in the conspiracy. Grant testified that the meeting at the garage on May 20 took place so that the individual with the money could observe the cocaine and then pay the undercover agent $21,000 for one kilogram of cocaine. It was reasonable for the jury to infer that Theodosopoulos—and not Shunnarah—was the "money man" in that although Shunnarah examined the cocaine in the Plush Pup parking lot, he did not complete the transaction at that time and rather, insisted that the transaction be completed at the automobile shop. *See United States v. Hernandez,* 948 F.2d 316, 321 (7th Cir.1991).

The government also points to Theodosopoulos's presence on two separate occasions on May 23, 1993, that demonstrate his participation in the conspiracy. The government proffered evidence that Theodosopoulos met and spoke with Ghanayem and Shunnarah in the alley behind Theodosopoulos's residence just moments after the two left to meet with their "money man" and just prior to Shunnarah's planned meeting with the undercover agent to give him the money. Grant and Shunnarah had decided to complete the drug deal on this day. It was reasonable for the jury to infer from the circumstances that since neither Ghanayem nor Shunnarah had money themselves, they were attempting to

---

9. We reach this conclusion without relying on the co-conspirator statements of Ghanayem and Shunnarah and therefore do not address the government's contention that the district court erred in excluding such evidence under Federal Rule of Evidence 801(d)(2)(E).

obtain purchase money elsewhere, such as from Theodosopoulos.

The government also argues that Theodosopoulos's presence in the parking lot on May 23, 1993, and his subsequent waving of money at Grant, further establish his participation in the conspiracy. Although "mere knowledge of, approval of, association with, or presence at a conspiracy is insufficient to establish ... participation," *Durrive*, 902 F.2d at 1225, a "defendant's presence at the scene where coconspirators acted in furtherance of the conspiracy's ultimate objective is a probative factor which may be considered with other factors in assessing the sufficiency of the evidence." *James*, 40 F.3d at 865 (citing *Burrell*, 963 F.2d at 988). Had Theodosopoulos simply been driving by the drug transaction—coincidentally in the wrong place at the wrong time—this would not be enough to establish his link to the conspiracy. However, at the exact moment in the transaction when the "money-man" would show the money to the supplier, Theodosopoulos stopped his car in front of Grant, Ghanayem and Shunnarah, and purposefully waived a handful of currency at them. It was entirely reasonable for the jury to conclude that the display of money was intended to advance the ends of the conspiracy by showing the suppliers that the money was present and the narcotics deal was about to be completed. The mere fortuitous presence at the scene where a crime takes place does not prove participation in the conspiracy, but the presence of the defendant at critical junctures, such as these, alone can establish a defendant's participation. *See United States v. Pazos*, 993 F.2d 136 (7th Cir.1993); *Burrell*, 963 F.2d at 990–91; *Cochran*, 955 F.2d at 1122.

Theodosopoulos argues that Grant's testimony that Theodosopoulos, while in the gray car, drove by Grant, Shunnarah and Ghanayem in the parking lot and flashed the money indicates that, if anything, Theodosopoulos did not intend to be part of any drug transaction. He argues that if he had intended to be a participant, he would have remained rather than left. The existence of an alternative explanation for Theodosopoulos's actions does not sink the government's case.

"The fact that the government's evidence might also be consistent with an alternate theory is irrelevant; the law does not require the government to *disprove* every conceivable hypothesis of innocence to sustain a conviction on an indictment proved beyond a reasonable doubt." *Townsend*, 924 F.2d at 1389 (citations omitted) (emphasis in original).

The government also introduced telephone records that established circumstantially that Shunnarah and Theodosopoulos had several conversations around the time of the planned money-for-cocaine exchange. Viewing this evidence in the light most favorable to the government, it was reasonable for a jury to conclude that the timing and circumstances surrounding the placing of these calls established that Shunnarah and Theodosopoulos were in contact at this time. On May 23, 1993, two one-minute calls—at 11:46 a.m. and 12:13 p.m.—were made from Ghanayem's cellular telephone (which was with Shunnarah at the time) to Theodosopoulos's residence. At 12:30 p.m., a single call was made from Theodosopoulos's home to Ghanayem's cellular phone. While the telephone calls by themselves are not dispositive, their timing is quite probative. All three calls took place immediately after Shunnarah spoke with Grant and informed him that they were still waiting for their money source (11:35 a.m.) and before Shunnarah contacted Grant to tell him that they were now ready to complete the drug transaction. (1:10 p.m.). Furthermore, it was immediately after the 12:13 p.m. call that Shunnarah and Theodosopoulos met in person behind the garage at Theodosopoulos's residence. It was reasonable for the jury to infer from the telephone calls that the two defendants had contacted each other and had done so for the purposes of furthering the criminal conspiracy. *See United States v. Hirschberg*, 988 F.2d 1509, 1516 (7th Cir.), *cert. denied*, — U.S. ——, 114 S.Ct. 311, 126 L.Ed.2d 258 (1993); *Burrell*, 963 F.2d at 991; *Hernandez*, 948 F.2d at 321.

Theodosopoulos argues that the absence of records of telephone calls—for example, between the Theodosopoulos residence and Lexington—undermines the relevance of the existence of the phone records on the date

and around the time of the proposed money-for-cocaine exchange. The jury, however, had the opportunity to consider this evidence at trial and weigh its importance, and was reasonable in ultimately concluding that Theodosopoulos participated in the conspiracy.

We recognize that the government's case was built in large part on circumstantial evidence, as is often true in conspiracy cases. It is also possible that we may have reached a different result if we had sat as jurors. However, "the mere existence of other possible hypotheses is not enough to remove the case from the jury." *United States v. Duarte,* 1 F.3d 644, 650 (7th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994). As we have cautioned before, Rule 29 is not a device to replace jury findings with the conclusions of district court judges. *Id.* We will only take a conviction away from a jury on sufficiency grounds when the government has offered no evidence from which a jury could conclude beyond a reasonable doubt that crime had been committed. *Atterson,* 926 F.2d at 655 ("We must affirm unless the record is barren of any evidence, regardless of its weight, from which the trier of fact could find guilt beyond a reasonable doubt."). Here, there was enough evidence, albeit circumstantial, for a reasonable jury to conclude beyond a reasonable doubt that a conspiracy did exist and Theodosopoulos was a knowing and active participant in it.

For the foregoing reasons, we REVERSE the district court's judgments of acquittal, AFFIRM the denial of Ghanayem's new trial motion, reinstate the jury verdicts, and REMAND for sentencing.