In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 14-3311 and 14-3363

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

VERNON CHAPMAN,

*Defendant-Appellant.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 11 CR 299 and 10 CR 961 — **Milton I. Shadur**, *Judge.*

ARGUED SEPTEMBER 11, 2015 — DECIDED OCTOBER 28, 2015

Before BAUER, WILLIAMS, and HAMILTON, *Circuit Judges.*

BAUER, *Circuit Judge.* On May 12, 2014, a jury convicted defendant-appellant, Vernon Chapman ("Chapman"), for distributing heroin and crack cocaine on five separate occasions. All of the drug transactions were recorded by an undercover informant wearing a Hawk recording device, which captured audio-video recordings of each transaction. The recordings were introduced at trial. Following his conviction, Chapman was sentenced to 200 months' imprisonment.

Chapman appeals his conviction on several grounds. First, he argues that the district court violated his constitutional rights to a fair trial by both refusing to grant him a third expert witness to examine the informant's recordings and by denying his motion to subpoena one of his earlier expert witnesses. Second, he argues that the district court erred in admitting the recordings at trial. Third, he argues that the district court erred in denying his motion for acquittal based on his defense of entrapment. Finally, he argues that his sentence of 200 months' imprisonment was unreasonable. For the reasons that follow, we affirm the district court's rulings.[1]

## I.  Factual Background

In 2010, the Chicago Police Department and the Federal Bureau of Investigations ("FBI") conducted a joint operation (code-named "Operation Blue Knight") to investigate and arrest individuals involved in drug trafficking on the West Side of Chicago. As part of the investigation, the government obtained the assistance of an undercover informant, Bernard Baggett ("Baggett"). Baggett agreed to engage in several drug transactions while wearing a Hawk recording device, which captured audio-visual recordings. Prior to each drug transaction, Baggett met with an FBI agent who installed and turned

---

[1] Chapman also includes a sentence immediately prior to the conclusion of his brief that simply states: "The district court should have given an instruction to the jury that the government may not originate a criminal design." Since Chapman provided no explanation, rationale, or authority to support this claim, it is waived on appeal. *See United States v. Foster*, 652 F.3d 776, 793 (7th Cir. 2011) ("As we have said numerous times, undeveloped arguments are deemed waived on appeal.") (citation omitted).

on the Hawk recording device. Once the device was activated, the agent stated the agent's name, the time, and the date. The agent also installed a transmitter on Baggett, so that the agent could listen to the real-time transactions as they unfolded. After each transaction concluded, Baggett would again meet with the same agent. The agent would restate the agent's name, as well as the time and date before deactivating the Hawk recording device and removing the transmitter. If at any point the Hawk recording device was turned off, a gap would appear in the recording's time stamp. Once the Hawk recording device was deactivated, it was returned to the FBI offices and attached to a computer, where the recordings were then downloaded onto a DVD through a software program.

At the government's direction, Baggett engaged in the following five drug transactions with Chapman while wearing the Hawk recording device:

> On July 19, 2010, two months after Chapman was released from prison for a prior narcotics conviction, Baggett called Chapman to see if he would sell him heroin. Chapman knew Baggett personally, and had known him for nearly all of his life. Chapman told Baggett to call him back. The following morning, July 20, 2010, Baggett left two voicemails on Chapman's phone. That afternoon, Baggett took the bus to the corner of Kedzie Avenue and Ohio Street[2] to purchase heroin from Chapman. Once he arrived,

---

[2]  All of the street intersections referenced within this opinion are located on the West Side of Chicago.

Baggett met Chapman and several other people. Chapman instructed one of the individuals present to sell two grams of heroin to Baggett. However, Baggett replied that he needed four. Chapman asked: "You got money for four?" Baggett gave Chapman the money he had, at which point Chapman directed an individual present to give Baggett one gram of heroin. Chapman assured Baggett that the heroin was high quality and had "ten pills on it." This referred to Dormin pills, which are used to cut stronger heroin in order to increase the quantity of the drug without significantly reducing its quality. Chapman also stated: "I'm [going to] have some new [heroin], you can put 20 [pills] on there. Just waiting to go back to the [supplier]." Following their initial meeting, Chapman obtained three additional grams of heroin for Baggett and delivered it to him that same day. The following morning, Chapman and Baggett spoke on the phone. During this conversation, Chapman promised Baggett the heroin quality would only get better.

On July 30, 2010, Baggett called Chapman in order to purchase more heroin. They had several conversations, which culminated with them agreeing to meet the following morning. On July 31, 2010, Baggett called Chapman and told him that he wanted to purchase three grams of heroin. Chapman responded: "All right." Chapman told Baggett to meet him at the corner of Sacramento Boulevard and Chicago Avenue. Baggett met Chapman at that

location and offered him $240 for three grams of heroin. Chapman refused to sell for that low of a price, at which point Baggett paid him $300. Chapman gave him the three grams of heroin and assured Baggett that this heroin was stronger than the previous, since it could take "fifteen [Dormin] pills a gram." The following day, Chapman and Baggett spoke over the phone and Chapman inquired whether Baggett was satisfied with the heroin. Baggett responded that he was and told Chapman to maintain that quality of heroin.

On August 17, 2010, Baggett spoke with Chapman over the phone and said that he wanted to purchase heroin and that he had $300 available. Baggett and Chapman agreed to meet at the corner of Cicero Avenue and Augusta Boulevard. Baggett met with Chapman at the intersection and gave him $280 in exchange for three grams of heroin. Chapman assured Baggett that this heroin could also take fifteen Dormin pills. Chapman offered to obtain future amounts of heroin for Baggett for $80 per gram.

On October 1, 2010, Baggett called and left three messages on Chapman's phone regarding purchasing more heroin. Eventually, the two spoke and Baggett told Chapman that he needed to purchase heroin that day. Chapman responded: "All right. I am going to be ready for you." Later that day, Baggett spoke with Chapman again and informed him he was interested in purchasing seven grams of

heroin for $700. The two men met on the corner of Kedzie Avenue and Ohio Street. When Baggett arrived, Chapman told him to get into another car driven by an individual acquainted with Chapman. Chapman stayed behind. The individual drove Baggett to a nearby residence, where the individual entered and retrieved seven grams of heroin for Baggett in exchange for $700.

On November 2, 2010, Baggett called Chapman and left two messages. That afternoon, he spoke with Chapman and said he was interested in purchasing two ounces of cocaine. A few hours later, Baggett met with Chapman in a parking lot at the intersection of Kedzie Avenue and Franklin Street. There were several other people in the parking lot as well. Chapman entered Baggett's van and asked: "What you say you trying to get?" Baggett replied that he had $1,600 with which to purchase two ounces of crack cocaine. Chapman responded: "Come on, let's roll." Chapman then spoke to the other individuals present at the parking lot, and made several phone calls to determine whether anyone else was interested in purchasing cocaine or heroin that day. Afterwards, Baggett and Chapman drove to a residence to pick up the crack cocaine. Along the way, Chapman bragged about the quality of the cocaine, and asked whether Baggett was satisfied with the heroin he had sold him. They eventually reached the residence, where they waited for Chapman's supplier to "cook it up." As they waited,

Chapman discussed that he had large quantities of marijuana that he was selling. The two eventually left the residence and went to Baggett's van. Chapman entered the van with a scale and measured two ounces of crack cocaine for Baggett. Chapman then left the vehicle, but called Baggett later that evening to be sure that Baggett was satisfied with the quality of the drugs he received.

Chapman was arrested on November 17, 2010. During his post-arrest statements, he admitted to selling drugs, as well as having access to drugs.

On January 6, 2011, a federal grand jury returned a single count indictment against Chapman for distribution of crack cocaine in violation of 21 U.S.C. § 841(a)(1). On December 15, 2011, a federal grand jury returned an additional indictment against Chapman charging him with four counts of distributing heroin in violation of 21 U.S.C. § 841(a)(1). The charges were consolidated into one proceeding.

## II. Motions for Experts

On July 9, 2012, Chapman filed a motion requesting the court to appoint an expert to examine the audio-video recording from the November 2, 2010, crack cocaine transaction. Chapman claimed that certain acts that he recalled doing and certain exonerating statements he remembered making were not included in the recording. The district court granted the motion and appointed Adam Dew ("Dew") as Chapman's expert to investigate the recording.

Dew owns and operates a video production company, and has over ten years of experience working with "digital video in all [its] forms." Dew received a DVD containing the Hawk recording device's audio-visual recording of the November 2, 2010, crack cocaine transaction. He examined the DVD and issued a report. In the "Summary of findings" section of his report, Dew stated:

> I came to the conclusion that the video as delivered to us on DVD does not appear to show any signs of tampering. I did not have access to the original camera recordings, only the time-stamped DVD … . The time-stamp does appear to indicate a continuous, uninterrupted recording … . [T]here is a glitch in the video with an audio skip, however [the] time code is continuous on the DVD. While we do lose sight of Chapman for a few moments … [the] time code is continuous on the DVD and there is no noticeable tampering with the recording.

On May 29, 2013, Chapman filed a second motion seeking appointment of a forensic expert to examine the November 2, 2010, recording. In the motion, Chapman again insisted that portions of the conversation between Chapman and Baggett had been removed. The district court again approved the motion, and appointed Barry Dickey ["Dickey"] as Chapman's second expert.

Dickey is an expert in "forensic evaluation and/or authentication of acoustical/visual media, including the analysis of elemental acoustics and video images contained therein." Dickey examined the DVD containing the November 2, 2010,

crack cocaine transaction and issued a report. His report stated that data from the DVD was "extracted into forensic software for examination." Dickey noted that the data appeared "consistent with surveillance recordings commonly associated with federal law enforcement agencies." Dickey's procedures included verifying the frame rate of the visual recording, examining the quality of the imaging, and examining the audio embedded from the Hawk recording device. In addition, "[an] overview of HBI/VBI, color scheme, vector/waveform, embedded data, transitions and other parameters were also performed." Dickey's report was as follows: "Data integrity checks verified the files as individually and collectively continuous … . Data creation and download time/date information was also verified … . All creation time and dates are sequentially uniform." Therefore, Dickey concluded: "[the November 2, 2010, recording] does not contain any anomaly which would question its authenticity as a continuous and reliable record of the events existing therein."

On December 26, 2013, Chapman filed a motion seeking appointment of a "computer expert," and explained that the prior two experts were insufficient because they were audio-visual experts. The district court conducted hearings regarding this motion on December 27, 2013, and January 8, 2014. At the hearings, the district court pointed out that Chapman did not produce any evidence supporting his theory that the recording had been tampered with, and that Chapman's prior two experts were unable to find any issue with the recording; therefore, there was no reason to justify the appointment of a third expert. The district court denied the motion.

On April 21, 2014, Chapman filed another motion seeking a third expert to examine the November 2, 2010, recording. On April 24, 2014, the district court conducted a hearing on that motion. The court stated: "There is simply no basis at all for appointing … another person, to examine the materials … in the prayerful hope that that doctor will disclose a different diagnosis than the prior doctors and will therefore provide one that helps Mr. Chapman's self-diagnosis." Chapman's counsel again said that the purpose of the third expert was to appoint a computer expert, as opposed to an audio-visual expert. The district court noted that: "[Chapman has] to have some plausibility predicate for advancing a claim, and there is nothing even to suggest the plausibility of that predicate [here]." The court suggested that it might have considered the appointment if Chapman had indicated any flaw in the software or system the government used to transfer the recording from the Hawk recording device onto the DVD. Since Chapman had no evidence to substantiate this claim, the district court denied the motion for a third expert.

We find no error in the district court's ruling.

### III.   Motion to Subpoena Dew

On December 17, 2013, Chapman filed a motion to subpoena Dew in order for him to testify that he did not receive the original recordings. On December 27, 2013, the district court conducted a hearing on the motion. The court denied this motion because Chapman's only basis for subpoenaing Dew was a single statement in Dew's report indicating that he did not have access to the "original camera recordings." Thus, the

district court found that allowing the subpoena would "make a mountain out of a very small molehill."

We find no error in the district court's ruling.

### IV.   Admission of the November 2, 2010, Recording

On October 17, 2013, Chapman filed a motion to compel the government to produce the "mirror of the hard drive from the computer that was used to download the recording." On November 15, 2013, Chapman filed a motion to compel the government to produce the original Hawk recording device that recorded the November 2, 2010, crack cocaine transaction.

On November 25, 2013, the district court conducted a hearing on the motions to compel. At the hearing, the government explained why it was unable to produce a "mirror image" of the computer's hard drive:

> [T]he short answer to that is that doesn't exist. And this is the reason why: For these Hawk recording devices there is a special software that is made by the company that makes the devices that is installed in about 20-plus computers in the FBI. Once an agent finishes—for example, after the transaction, [and] comes back to the offices … [the agent] attaches that device to one of these particular computers that has the software. The software then acts almost like a conduit from the recording device to whether it is a CD or DVD … . And then nothing is stored on that computer … . And so there is nothing that is saved on the particular computer that the defendant can have a mirror image of because nothing is stored

on the computer. It is only on that original [CD or DVD].

Chapman responded that the government had violated the rules of discovery by destroying the original recording. The district court rejected Chapman's argument and denied the motion.

On May 5, 2014, Chapman proceeded to trial. All of the recordings were admitted into evidence. The government established a proper foundation for each individual recording. Regarding the November 2, 2010, recording, an FBI special agent who worked on the case testified that he activated the Hawk recording device on November 2, 2010, as well as listened to the real-time crack cocaine transaction as it occurred over the transmitter. The agent similarly deactivated the Hawk recording device when Baggett returned with the crack cocaine, and downloaded the recording onto the DVD. He also testified that the Hawk recording device was working properly that day. He listened to the recording after it was downloaded onto the DVD, and found that the recording was a true and accurate depiction of the conversation he heard. After verifying the recording, he initialed the DVD. That DVD, with the agent's initials, was introduced at trial.

On appeal, Chapman argues that the district court violated the Best Evidence Rule by admitting the recording of the November 2, 2010, crack cocaine transaction at trial.

Under the Best Evidence Rule, an "original writing, recording, or photograph is required in order to prove its content unless [the Federal Rules of Evidence] or a federal statute provides otherwise." FED. R. EVID. 1002. However, "[a]

*duplicate* is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity." FED. R. EVID. 1003 (emphasis added). A "duplicate" is defined as: "a counterpart produced by … electronic, or other equivalent process or technique that accurately reproduces the original." FED. R. EVID. 1001(e). Furthermore, if a party challenges the admission of a duplicate, it is the challenger's burden to demonstrate that a "genuine issue of authenticity exists." *Tyson v. Jones & Laughlin Steel Corp.*, 958 F.3d 756, 761 (7th Cir. 1992).

Chapman claims that the data on the Hawk recording device constitutes the "original recording," and thus the DVD is non-admissible under the Best Evidence Rule. However, even assuming that the data on the Hawk recording device is the "original," the DVD constitutes a "duplicate" because the computer's software was an electronic process that, according to the special agent's testimony, reproduced a true and accurate copy of the November 2, 2010, recording. Furthermore, Chapman did not raise a genuine issue of authenticity regarding the DVD.

We find no error in the district court's evidentiary ruling.

### V. Entrapment

At trial, Chapman did not deny his involvement in the drug transactions, but claimed entrapment by the government. At the conclusion of the government's evidence, Chapman filed a motion for acquittal based on entrapment, which the district court denied.

To establish the defense of entrapment, a defendant must show "government inducement" of the crime, and defendant's "lack of predisposition" to commit the crime. *United States v. Theodosopoulos*, 48 F.3d 1438, 1444 (7th Cir. 1995) (citations omitted). In order to establish "inducement," the defendant must show that the government solicited the crime, "*plus* some other government conduct that creates a risk that a person who would not commit the crime if left to his own devices will do so in response to the government's efforts." *United States v. Mayfield*, 771 F.3d 417, 434–35 (7th Cir. 2014) (*en banc*) (emphasis in original). In order to establish "lack of predisposition," the court examines five relevant factors: the defendant's character or reputation; whether the crime was originally suggested by the government; whether the defendant engaged in criminal conduct for profit; whether there was evidence that the defendant was reluctant to commit the crime; and the nature of the government's persuasion. *Theodosopoulos*, 48 F.3d at 1444 (citations omitted).

In this case, the evidence presented at trial was sufficient to establish that Chapman was not induced by the government to commit the heroin and crack cocaine transactions. Chapman claims that Baggett relied on their friendship to convince him to sell him heroin and crack cocaine. But, the recordings do not demonstrate any persuasion other than a basic inquiry into the price and quantity Chapman was willing to accept. The evidence presented at trial sufficiently established that there was no inducement, and that Chapman was predisposed to engage in drug transactions.

We find no error in the district court's ruling.

## VI. Sentencing

On October 6, 2014, the district court conducted a sentencing hearing. Chapman's counsel argued that Chapman should receive an acceptance of responsibility credit because he never claimed that he did not commit the crimes. The district court denied the credit. After determining that the appropriate Sentencing Guidelines range was between 360 months to life, the district court sentenced Chapman to 200 months' imprisonment. Chapman appeals that this sentence was unreasonable because he should have received the responsibility credit, and the sentence imposed constituted an unwarranted disparity.

### A. Responsibility Credit

We review a denial of responsibility credit for clear error, while granting "great deference" to the district court. *United States v. Collins*, 796 F.3d 829, 835–36 (7th Cir. 2015) (citations omitted).

In this case, the district court denied Chapman's request for acceptance of responsibility credit due to his behavior throughout the proceedings. Specifically, the district court noted that it did not believe Chapman was truthful in his trial testimony, and that Chapman's statements at the sentencing hearing were not "forthright." Since the district court is entitled to great deference and our circuit's precedent has established that dishonesty and unsupported factual allegations are sufficient to deny acceptance of responsibility credit, *see United States v. Jones*, 52 F.3d 697, 701 (7th Cir. 1995), *United States v. Munoz*, 610 F.3d 989, 993–94 (7th Cir. 2010), we hold that the district court did not commit error, let alone clear error, in denying Chapman's request.

Chapman argues that since he admitted to committing the crimes, he is entitled to the acceptance of responsibility credit. However, Chapman's acknowledgment of his involvement in the drug transactions does not mandate that the district court grant the reduction. *See Jones*, 52 F.3d at 701 (finding that if a defendant has not truthfully described and accepted responsibility, "bare statements of remorse and acceptance of responsibility will not compel the reduction") (citation omitted).

### B. Unwarranted Disparity

Chapman also argues that his sentence of 200 months' imprisonment was unreasonable under 18 U.S.C. § 3553(a)(6) due to the disparities between the perceived strictness of his sentence against other criminals convicted under Operation Blue Knight. In support, Chapman cites several specific defendants who also were labeled career criminals, but received sentences of less than 120 months' imprisonment.

Pursuant to 18 U.S.C. § 3553(a)(6), district courts should prevent "unwarranted sentence disparities" between defendants who have similar records and are convicted of similar conduct. However, the key phrase is *unwarranted* sentence disparities. *See United States v. Statham*, 581 F.3d 548, 556 (7th Cir. 2009) (emphasis added) (citation omitted). A sentencing disparity among similar defendants by itself is insufficient to render a particular criminal sentence unreasonable.

In this case, the district court properly found that Chapman's total offense level was 37, and that he had a category VI criminal history. As a result, the appropriate Sentencing Guidelines range was between 360 months to life imprisonment. The government agreed that was the correct range, but

recommended a sentence ranging from 262 to 327 months' imprisonment. The district court sentenced Chapman to 200 months' imprisonment, well below both the Sentencing Guidelines and the prosecution's recommendation. The Seventh Circuit has held that a sentence *below* the Sentencing Guidelines range is not an unwarranted disparity. *United States v. Gonzalez*, 765 F.3d 732, 740 (7th Cir. 2014) (emphasis in original) (citation omitted).

Furthermore, in his brief, Chapman makes an additional unwarranted sentence disparity argument. He claims that the Sentencing Guidelines range was so severe due to the government informant requesting crack cocaine during the November 2, 2010, transaction. Chapman argues that had the government not directed the informant to request crack cocaine, he would have received a lower Sentencing Guidelines range; and thus this makes the sentencing disparity unwarranted. This is not a cognizable unwarranted disparity argument. *See, e.g.*, *Gonzalez*, 765 F.3d at 739 (discussing how unwarranted sentencing disparities result when multiple defendants are convicted of similar conduct, yet one defendant receives a different sentence due to "alienage, race, [or] sex").

### VII. Conclusion

Therefore, for the foregoing reasons, the judgment of the district court is AFFIRMED.